Eleanor A. DuBay, OSB No. 073755
TOMASI SALYER MARTIN
121 SW Morrison St, Suite 1850
Portland, OR 97204
edubay@tomasilegal.com
Phone: (503) 894-9900
      Attorneys for Tasha Teherani-Ami

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF OREGON

| | |
|---|---|
| In re<br><br>15005 NW Cornell LLC; and<br>Vahan M. Dinihanian, Jr.,<br><br>      Debtors. | Bankruptcy Case Nos.:<br><br>19-31883-dwh11 (Lead Case)<br><br>19-31886-dwh-11<br><br>Jointly Administered Under<br>Case No. 19-31883-dwh11<br><br>THIRD SUPPLEMENTAL DECLARATION OF ELEANOR A. DUBAY IN SUPPORT OF CREDITOR TASHA TEHERANI-AMI'S MOTION TO DISMISS AND MOTION FOR RELIEF FROM STAY |

I, Eleanor A. DuBay, after being duly sworn, depose and say:

1.      I am an attorney at Tomasi Salyer Martin. I represent Creditor, Tasha Teherani-Ami ("Creditor"), in the above-referenced action. I make this Declaration in support of Creditor's Motion to Dismiss [158] and Motion for Relief [106].

2.      This Declaration is based upon my personal knowledge of the facts set forth herein or a review of my firm's file and records related to these bankruptcy cases. In the

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

ordinary course of its business, my firm regularly maintains litigation files which include copies of pleadings and briefing in cases in which it represents a party, correspondence, and other items such as court and deposition transcripts and copies of exhibits. I have personal knowledge of my firm's procedures for creating and maintaining pleadings files. If called upon to testify regarding the matters set forth herein, I could confidently do so.

3.      On July 17, 2020, an evidentiary hearing was held in the above-entitled action at which hearing the testimony of Vahan M. Dinihanian, Jr. was heard. Attached hereto as Exhibit 1 is a transcript of the testimony of Vahan M. Dinihanian, Jr. from the July 17, 2020 evidentiary hearing.

I HEREBY DECLARE THAT THE ABOVE STATEMENTS ARE TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF, AND THAT I UNDERSTAND THAT IT IS MADE FOR USE AS EVIDENCE IN COURT AND IS SUBJECT TO PENALTY FOR PERJURY.

Dated: July 28, 2020.

TOMASI SALYER MARTIN


By: /s/ Eleanor A. DuBay
    Eleanor A. DuBay, OSB #073755
    (503) 894-9900
    edubay@tomasilegal.com
    Of Attorneys for Tasha Teherani-Ami

Page 2 – THIRD SUPPLEMENTAL DECLARATION OF ELEANOR A. DUBAY IN SUPPORT OF CREDITOR TASHA TEHERANI-AMI'S MOTION TO DISMISS AND MOTION FOR RELIEF FROM STAY
TEHERA-B1\00524441.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

Case 19-31883-dwh11   Doc 273   Filed 07/28/20

# CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2020 I served a copy of the foregoing **THIRD SUPPLEMENTAL DECLARATION OF ELEANOR A. DUBAY IN SUPPORT OF CREDITOR TASHA TEHERANI-AMI'S MOTION TO DISMISS AND MOTION FOR RELIEF FROM STAY** by electronic means using ECF to the parties listed below:

STEPHEN P ARNOT on behalf of U.S. Trustee US Trustee, Portland
steve.arnot@usdoj.gov

NICHOLAS J HENDERSON on behalf of Debtor Vahan M. Dinihanian, Jr. and Jointly Administered Debtor Vahan M. Dinihanian, Jr.
nhenderson@portlaw.com,
tsexton@portlaw.com;mperry@portlaw.com;hendersonnr86571@notify.bestcase.com

ELAYNA Z MATTHEWS on behalf of Creditor Columbia State Bank
elayna@sglaw.com, ktate@sglaw.com

BRUCE H ORR on behalf of Interested Party Tasha Teherani-Ami, in her capacity as the trustee of the Sonja Dinihanian GST Trust DTS 1/1/11
bho@wysekadish.com, tn@wysekadish.com;drw@wysekadish.com

ERICH M PAETSCH on behalf of Creditor Columbia State Bank
epaetsch@sglaw.com, ktate@sglaw.com

DOUGLAS R PAHL on behalf of Debtor 15005 NW Cornell LLC and Interested Party 15005 NW Cornell LLC
dpahl@perkinscoie.com, nlesage@perkinscoie.com;docketpor@perkinscoie.com

TROY SEXTON on behalf of Jointly Administered Debtor Vahan M. Dinihanian, Jr.
tsexton@portlaw.com, nhenderson@portlaw.com,mperry@portlaw.com,troy-sexton-4772@ecf.pacerpro.com

DANIEL L STEINBERG on behalf of Creditor Cornell Rd LLC and Creditor Lillian Logan
Daniel.Steinberg@jordanramis.com, Litparalegal@jordanramis.com

US Trustee, Portland
USTPRegion18.PL.ECF@usdoj.gov

Dated: July 28, 2020.

TOMASI SALYER MARTIN

By: /s/ Eleanor A. DuBay
    Eleanor A. DuBay, OSB #073755
    (503) 894-9900
    edubay@tomasilegal.com
    Of Attorneys for Tasha Teherani-Ami

CERTIFICATE OF SERVICE
TEHERA-B1\00524441.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

Case 19-31883-dwh11    Doc 273    Filed 07/28/20

1     UNITED STATES BANKRUPTCY COURT

2      DISTRICT OF OREGON

3

4 In re:

5

6 15005 NW Cornell LLC; and ) Bankruptcy Case Nos.:

7 Vahan M. Dinihanian, Jr. ) 19-31883-dwh11 (Lead Case)

8     Debtors.  ) 19-31886-dwh-11

9        ) Jointly Administered Under

10 _____ ) Case No. 19-31883-dwh11

11

12     TRANSCRIPT OF TESTIMONY

13    OF VAHAN MAGAR DINIHANIAN, JR.

14      July 17, 2020

15

16

17

18    BE IT REMEMBERED THAT on July 17, 2020, the

19 above-entitled case came on regularly for a telephonic

20 hearing before the HONORABLE DAVID W. HERCHER, a United

21 States Bankruptcy Judge.

22

23

24

25

```
 1                    APPEARANCES:

 2    ATTORNEY APPEARING VIA TELEPHONE IN BEHALF OF DEBTOR:

 3    Nicholas J. Henderson
      Motschenbacher & Blattner LLP
 4    117 SW Taylor Street, Suite 300
      Portland OR  97204
 5    503 417-0508
      nhenderson@portlaw.com
 6
      ATTORNEY APPEARING VIA TELEPHONE IN BEHALF OF DEBTOR
 7    15005 NW CORNELL, LLC:

 8    Douglas Pahl
      Perkins Coie LLP
 9    1120 NW Couch, 10th Floor
      Portland OR  97209
10    503 727-2087
      dpahl@perkinscoie.com
11
      ATTORNEY APPEARING VIA TELEPHONE IN BEHALF OF TEHERANI-
12    AMI:

13    Eleanor DuBay
      Tomasi Salyer Martin
14    121 SW Morrison, Suite 1850
      Portland OR  97204
15    503 894-9900
      edubay@tomasilegal.com
16
      ATTORNEY APPEARING VIA TELEPHONE IN BEHALF OF THE TRUST:
17
      Bruce H. Orr
18    Wyse Kadish LLP
      900 SW Fifth Avenue, Suite 2000
19    Portland OR  97204
      503 228-8448
20    bho@wysekadish.com

21    ATTORNEY APPEARING VIA TELEPHONE IN BEHALF OF CORNELL
      ROAD, LLC, ET AL:
22
      Daniel L. Steinberg
23    Jordan Ramis PC
      2 Centerpointe Drive, 6th Floor
24    Lake Oswego OR  97035
      503 598-7070
25    daniel.steinberg@jordanramis.com
```

IBA
SYMONDS
&DUNN
(503) 224-4128

EXHIBIT 1
Page 2 of 80

Case 19-31883-dwh11    Doc 273    Filed 07/28/20

1                    I N D E X

2

3   WITNESS VAHAN DINIHANIAN                     PAGE

4

5   CROSS-EXAMINATION BY MS. DUBAY               6

6   REDIRECT EXAMINATION BY MR. HENDERSON        18

7   RECROSS-EXAMINATION BY MR. ORR               21

8   REDIRECT EXAMINATION BY MR. PAHL             70

9   RECROSS-EXAMINATION BY MR. ORR               75

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 19-31883-dwh11    Doc 273    Filed 07/28/20

EXHIBIT 1
Page 3 of 80

1          VAHAN MAGAR DINIHANIAN, JR.

2    was thereupon produced via telephone as a witness in

3    behalf of the Debtors and, having been first duly sworn

4    on oath, was examined and testified as follows:

5

6          THE COURT:  Thank you, Mr. Dinihanian.  The

7    first question I have is one which leads to the matter

8    in which we're presenting evidence today.  And I need to

9    ask if you're in a room by yourself.

10          THE WITNESS:  Yes, I am.

11          THE COURT:  Okay.  And I also need to

12   instruct you that you're not to communicate -- while

13   giving evidence, while you're under oath and giving

14   evidence, you're not to communicate with anybody and

15   you're not to refer to any documents other than exhibits

16   that the parties have made available to you and referred

17   to in their questions.  Do you understand?

18          THE WITNESS:  Yes.

19          THE COURT:  Very good.

20       Ms. DuBay, you may proceed.

21          MR. HENDERSON:  Your Honor, this is Nick

22   Henderson.  I apologize for cutting in here.  I just

23   wanted to make sure I'm clear on the sequence of

24   presentation of evidence.  And I guess perhaps I'd like

25   to proffer Mr. Dinihanian's declaration, which is Docket

IBA
SYMONDS
&DUNN
(503) 224-4428

EXHIBIT 1
Page 4 of 80

Case 19-31883-dwh11    Doc 273    Filed 07/28/20

1   No. 254 in the lead case.  If Ms. DuBay is crossing, I

2   guess she's probably cross-examining Mr. Dinihanian

3   based on the statements made in the declaration; so I

4   think that the declaration should be submitted first.

5   And since Mr. Dinihanian's on the phone, I would proffer

6   that he's able and would affirm to all of the statements

7   made in the declaration.

8           THE COURT:  Well, there are probably some

9   niceties that we're skipping over here.  The movants do

10   have the burden of proof and technically we're in the

11   movant's case in chief.  The movant is, of course,

12   entitled to call Mr. Dinihanian as a -- as their own

13   witness, and that's the way I understood it.

14           Now, for -- and that, of course, Mr. Dinihanian's

15   counsel, debtor's counsel, could offer his declaration

16   as rebuttal testimony.  I think we're sort of collapsing

17   those issues, which may be okay, but I just wanted to

18   clarify --

19           Well, Ms. DuBay, are you treating, then, the

20   declaration as admitted and then proceeding to

21   cross-examine as though we were at the stage of

22   accepting rebuttal testimony from the debtor as to your

23   case in chief?

24           MS. DUBAY:  Yes, your Honor.  That was my

25   understanding.

IBA
SYMONDS
&DUNN
(503) 224-4438
Case 19-31883-dwh11    Doc 273    Filed 07/28/20
EXHIBIT 1
Page 5 of 80

1          THE COURT:  Okay.  Any objection, Ms. DuBay,

2   to admission of the declaration?

3          MS. DUBAY:  No, your Honor.

4          THE COURT:  Good.  The declaration is

5   admitted.

6       Anything else, Mr. Henderson?

7          MR. HENDERSON:  No, your Honor.  Thank you.

8          THE COURT:  Thank you.

9       Go ahead, Ms. DuBay.

10         MS. DUBAY:  Thank you, your Honor.

11

12                  CROSS-EXAMINATION

13  BY MS. DUBAY:

14    Q.  Mr. Dinihanian, I would like to start with your

15  declaration that we were just discussing.  I believe you

16  should have a copy of that with you.

17    A.  Yes.

18         THE COURT:  Ms. DuBay, I'm going to try to

19  follow along.  I've got a lot of electronic versions of

20  these documents.  It would probably help me if you would

21  remind me as you switch between the documents what the

22  docket item numbers are.

23         MS. DUBAY:  Yes, of course, your Honor.  The

24  docket number for the declaration is 254.

25         THE COURT:  Very good.  Thank you.  Go

IBA
SYMONDS
&DUNN
(503) 224-4438

Case 19-31883-dwh11    Doc 273    Filed 07/28/20

EXHIBIT 1
Page 6 of 80

1  ahead.

2      Q.  (By Ms. DuBay)  Mr. Dinihanian, I'm going to

3  return to paragraph 6 of that declaration, which is on

4  page 2.  And in that paragraph you state that

5  Ms. Teherani-Ami held a second position deed of trust

6  against the Skyline property; is that correct?

7      A.  I'm reading it right now.  That's what it says,

8  yes.

9      Q.  But isn't it true that Ms. Teherani-Ami's deed of

10 trust on the Skyline property is in first lien position?

11     A.  I'd have to refer to counsel on that.

12     Q.  Mr. Dinihanian, this is a declaration that you

13 signed under penalty of perjury, which includes the

14 statement that Ms. Teherani-Ami held a second position

15 deed of trust.  I would like to confirm whether you

16 agree that Ms. Teherani-Ami's deed of trust is in first

17 position or second position.

18     A.  I'd like to talk to counsel about my answer to

19 that.  I thought that I was declaring properly.

20         THE COURTROOM DEPUTY:  This is the courtroom

21 deputy.  Mr. Dinihanian, if you are on a speaker phone,

22 could you please pick up the handset?  Thank you.

23         THE COURT:  And let me address

24 Mr. Dinihanian.  To the extent he's requesting an

25 opportunity to visit with counsel before answering the

IBA
SYMONDS
&DUNN
(503) 224-4138
EXHIBIT 1
Page 7 of 80
Case 19-31883-dwh11    Doc 273    Filed 07/28/20

1    question, I'm going to deny the request.

2         Sir, unless your lawyers object to a question,

3    you'll need to answer it while you're under oath here,

4    answer it to the best of your ability, but there will

5    not be a recess for you to consult with counsel before

6    answering questions.

7         MR. HENDERSON:  Your Honor, this is Nick

8    Henderson.  I would object to the extent that

9    Ms. DuBay's question may call for discussion of

10   communications between attorney and client.

11        THE COURT:  I don't think that it does.  I

12   think it just calls for his understanding of the

13   priority of the deed of trust; so I'll overrule the

14   objection.

15        MS. DUBAY:  Thank you, your Honor.  I don't

16   believe there was still a question pending, so I'll go

17   ahead and ask another question.

18   Q.  (By Ms. DuBay)  So, again, I don't believe we

19   received an answer to the question.  Isn't it true that

20   Ms. Teherani-Ami's deed of trust on the Skyline property

21   is in first lien position?

22   A.  I don't know that answer.

23   Q.  In your schedules and filed as a proof of claim

24   in both cases there is a claim from Bateman Seidel and

25   Daniel Lorenz; is that correct?

IBA
SYMONDS
&DUNN
(503) 224-4438
Case 19-31883-dwh11    Doc 273    Filed 07/28/20

EXHIBIT 1
Page 8 of 80

1      A.   I'm not sure.

2      Q.   Were Mr. Lorenz and Bateman Seidel your attorneys

3  in the partition litigation case?

4      A.   Yes, they were.

5      Q.   And you owe them unpaid attorney fees for their

6  representation of you; is that correct?

7      A.   Correct.

8      Q.   And you executed a deed of trust to Bateman

9  Seidel and Daniel Lorenz for these unpaid attorney fees

10 and costs; is that correct?

11     A.   Correct.

12     Q.   And you recorded that deed of trust on the

13 Skyline property, true?

14     A.   True.

15     Q.   And to the best of your knowledge, it's also

16 correct that Ms. Teherani-Ami has not executed a

17 subordination agreement for her deed of trust?

18     A.   We didn't need one.

19     Q.   Can you please explain by what you mean "We

20 didn't need one"?

21     A.   There was 250,000 of the value of the property

22 available, and I had paid everything that -- that I said

23 that I would pay in the -- in the -- in the agreement to

24 pay the debt.  She got property and cash, and that was

25 paid.  And then, according to the ruling and according

IBA
SYMONDS
&DUNN
(503) 224-4428
Case 19-31883-dwh11    Doc 273    Filed 07/28/20

EXHIBIT 1
Page 9 of 80

1  to the decree, I was able to use 250,000 available on my

2  house, and that's what I did.

3      Q.   But it's correct that you have not paid

4  Ms. Teherani-Ami the $2.25 million money award; is that

5  correct?

6      A.   That's correct.

7      Q.   So moving on in your declaration, again that's

8  Document No. 254, paragraph 8 and 17 of that declaration

9  reference your daughter, Sonja, that your intentions are

10  to preserve assets for her benefit; is that correct?

11     A.   That's correct.

12     Q.   And, in fact, the divorce judgment, which is

13  Exhibit 1 to the stipulated facts, which is Document

14  No. 250, that divorce document provides that you are

15  custodian of an investment account held in trust for the

16  benefit of your daughter, Sonja; correct?

17     A.   Correct.

18     Q.   And didn't you request in the divorce proceeding

19  to remain as custodian of that investment account in

20  order to manage the assets for the benefit of your

21  daughter?

22     A.   I don't remember if I made that assertion, but

23  I -- I am (inaudible) --

24     Q.   I'm sorry.  Were you going to continue or was

25  that your response?

IBA
SYMONDS
&DUNN
(503) 224-4438
Case 19-31883-dwh11    Doc 273    Filed 07/28/20

EXHIBIT 1
Page 10 of 80

 1      A.   That's my response.   No, I'm the custodian of her
 2   assets.
 3      Q.   And isn't it true that between March of 2018 and
 4   August of 2018 you removed $20,000 from that investment
 5   account held in trust for your daughter and deposited
 6   into your Eagle Holdings account?
 7      A.   Correct.
 8           MR. PAHL:   Objection, your Honor.   This is
 9   Doug Pahl.   I don't see how this is relevant to a good
10   faith filing issue or any other issue pending before the
11   Court at this point.
12           THE COURT:   Ms. DuBay?
13           MS. DUBAY:   Yes, your Honor.   This evidence
14   is used for impeachment purposes of Mr. Dinihanian's
15   declaration, statements in his declaration.
16           THE COURT:   So what statement of the
17   declaration are you impeaching?
18           MS. DUBAY:   Paragraph 18, quote, "My
19   intentions have always been to preserve my assets for
20   the benefit of my daughter."   And then paragraph 17, "My
21   intention in these two cases are to repay my debts in
22   full but to preserve as much value as possible for
23   myself and my daughter.   In my opinion, the foreclosure
24   of the Cornell property was disastrous for myself and
25   the trust."

IBA
SYMONDS
&DUNN
(503) 224-4428
Case 19-31883-dwh11   Doc 273   Filed 07/28/20
EXHIBIT 1
Page 11 of 80

1          THE COURT:  I'll overrule the objection.

2       Mr. Dinihanian, you can answer the question.

3          THE WITNESS:  I just feel, your Honor, that

4    I'm doing the proper thing.  I'm trying to survive in

5    any way that I possibly can to pay bills in this -- this

6    extremely lengthily amount of time that it is taking to

7    solve this debt and pay all my debts.  And I'm fully

8    intending to pay everything that is owed.  And I'm just

9    trying to get by in any way that I possibly can so that

10   I don't, you know, fail completely --

11         MS. DUBAY:  Your Honor?

12         THE WITNESS:  -- and not able to operate.

13         MS. DUBAY:  Your Honor, I object to the

14   response as nonresponsive to the question.

15         THE COURT:  Do you want to -- do you want to

16   restate the question, then I'll consider whether or not

17   to order him to answer it directly.

18         MS. DUBAY:  Yes, your Honor, I'll restate

19   the question.

20   Q.  (By Ms. DuBay)  Mr. Dinihanian, isn't it true

21   that between March of 2018 and August of 2018 you

22   removed $20,000 from the investment account held on

23   behalf of your daughter, Sonja, and deposited those

24   funds into your Eagle Holdings account?

25   A.  I did remove some money.  I don't recall the

IBA
SYMONDS
&DUNN
(503) 224-4428
Case 19-31883-dwh11    Doc 273    Filed 07/28/20

EXHIBIT 1
Page 12 of 80

1   exact amount or the date, the exact dates that I did

2   that.  But, to answer your question, yes.

3      Q.  And isn't it true that you then used the $20,000

4   to pay Eagle Holdings' bills?

5      A.  I'm not sure what bills that I used it to pay,

6   but I'm just trying to get by in any way that I possibly

7   can so that I can pay my bills.

8      Q.  So turning back to your declaration, Document

9   No. 254, paragraph 14 states that you had personally

10  guaranteed a loan that was maturing that was owed by

11  2275 West Burnside, LLC; is that correct?

12     A.  Correct.

13     Q.  And was that lender of that maturing loan IQ

14  Credit Union?

15     A.  Correct.

16     Q.  Did you include IQ Credit Union or the personal

17  guarantee of that maturing loan in your bankruptcy

18  schedules?

19     A.  I would have to go back and check with counsel to

20  see if, you know, if I did that.  I don't recall.

21     Q.  Paragraph 14 also states that you were at risk of

22  default because of that maturing loan; so you refinanced

23  that loan.  Was the new lender Juniper Capital

24  Corporation?

25     A.  No.  Juniper Corporation is on a different

IBA
SYMONDS
&DUNN
(503) 224-4438
Case 19-31883-dwh11    Doc 273    Filed 07/28/20
EXHIBIT 1
Page 13 of 80

1  property, and I financed two properties that I purchased

2  with the 1031 exchange funds from 2275 West Burnside.

3      Q.  So after --

4      A.  2275 --

5      Q.  I'm sorry.  Go ahead.

6      A.  There's the address of 2275 West Burnside and

7  then there's the LLC, 2275 West Burnside, LLC, which is

8  the LLC that owned the property.

9      Q.  So in July of 2019, after these cases were filed,

10 you refinanced two different loans?

11     A.  Correct.

12     Q.  So the loan that you're referencing in paragraph

13 14 that was for IQ Credit Union, what lender did you

14 refinance that loan with?

15     A.  They still have the loan.

16     Q.  I'm sorry.  I didn't hear that statement.  It was

17 muffled.  Could you please repeat?

18     A.  I still have the loan with IQ.

19     Q.  So when it says that you refinanced that maturing

20 debt, you refinanced that debt with IQ Credit Union?

21     A.  Correct.

22     Q.  And so Juniper Capital Corporation is a lender on

23 a different refinance?

24     A.  Correct.

25     Q.  And that refinance also occurred in July of 2019?

IBA
SYMONDS
&DUNN
(503) 224-4438
Case 19-31883-dwh11    Doc 273    Filed 07/28/20

EXHIBIT 1
Page 14 of 80

1      A.   I don't know.  I don't recall the date.

2      Q.   Did you sign a personal guarantee for the IQ

3   Credit Union refinance?

4      A.   I believe I did, but not -- I'm not certain if it

5   was personal, personal guarantee.

6      Q.   And you did sign a personal guarantee for the

7   Juniper Capital Corporation loan; is that correct?

8      A.   I would have to go back and check and see what

9   the language is on the loan, whether I took personal or

10  what it was, but I guaranteed it, yeah.

11     Q.   And the amount of the refinance for the Juniper

12  Capital Corporation loan was over a million dollars;

13  correct?

14     A.   Right, correct.

15     Q.   How much was the loan for the IQ Credit Union

16  refinance?

17     A.   I would have to go back and check on the numbers.

18     Q.   Was it over a million dollars?

19     A.   I would have to go back and check.

20     Q.   So in July of 2019, or after these cases were

21  filed in 2019, you executed two guarantees for two

22  different refinances; is that correct?

23     A.   I believe so, yes.

24     Q.   And then paragraph 14 says that you regularly

25  signed guarantees for mortgage debts; is that correct?

IBA
SYMONDS
&DUNN
(503) 224-4428
Case 19-31883-dwh11    Doc 273    Filed 07/28/20

EXHIBIT 1
Page 15 of 80

1    A.   I mean I'm -- that's correct.  I'm running my

2  other LLCs.

3    Q.   So do you personally guarantee debt for your

4  other LLCs?

5    A.   Yes.

6    Q.   So it's fair to say that you understand that you

7  are personally liable for the debts of your LLCs that

8  you are guaranteeing; is that correct?

9    A.   Correct.

10   Q.   So turning to the last page of your declaration,

11  again that's Document No. 254, we're looking at

12  paragraph 19.  And that paragraph states that Sortis

13  Capital was willing to provide two loans to you; is that

14  correct?

15   A.   Correct.

16   Q.   And were those loans to be secured by the Cornell

17  property?

18   A.   Well, I haven't seen the term sheet on the exact

19  security of those loans.

20   Q.   So you've not reviewed any documentation from

21  Sortis Capital regarding their willingness to provide

22  those two loans?

23   A.   It's -- our communication has been verbal, and

24  they are willing to provide financing.

25   Q.   Mr. Dinihanian, did you review the motion to

IBA
SYMONDS
&DUNN
(503) 224-4438
Case 19-31883-dwh11    Doc 273    Filed 07/28/20

EXHIBIT 1
Page 16 of 80

1  obtain financing that was filed by your attorneys in

2  this case?

3      A.   Yes, I -- yes.

4      Q.   Did you review the loan agreement that was

5  attached to that motion?

6      A.   Yes.

7      Q.   So in that loan agreement, when it says that the

8  loans were to be secured by the Cornell property, did

9  you review that provision?

10     A.   Yes.

11     Q.   So is it fair to say that the two loans that

12 you're referencing in paragraph 19 were supposed to be

13 secured by the Cornell property?

14     A.   Yes.

15     Q.   And according to paragraph 19, the funds from the

16 loans were supposed to be used, in part, to continue

17 with the partition litigation; is that correct?

18     A.   Yes.

19     Q.   So the loans secured by the Cornell property were

20 going to be given to you before the completion of the

21 partition litigation; correct?

22     A.   Yes.

23     Q.   So I want to return just one more time, if you

24 will, to paragraph 14, again, that's regarding the

25 personal guarantees, and I just want to follow up with

IBA
SYMONDS
&DUNN
(503) 224-4438
Case 19-31883-dwh11    Doc 273    Filed 07/28/20

EXHIBIT 1
Page 17 of 80

1  one more question.  That when you signed the personal

2  guarantees for the refinances last summer, after these

3  cases were commenced, you did not disclose those

4  personal guarantees in any amended schedule or in your

5  disclosure statement; is that correct?

6      A.  Correct.

7          MS. DUBAY:  Your Honor, I believe that's all

8  the questions I have at this time.

9          THE COURT:  Thank you.  Let's consider this

10  your -- I'm not sure the labels matter, but if we were

11  proceeding more regularly, we would treat him as a

12  witness called in your case in chief.  This would have

13  been your direct examination with permitted leading

14  questions.

15      So at this stage, I think I'll turn to Mr. -- I'm

16  sorry, Mr. Henderson for cross-examination.

17          MR. HENDERSON:  Thank you, your Honor.

18

19              REDIRECT EXAMINATION

20  By MR. HENDERSON:

21      Q.  Mr. Dinihanian, this is your attorney, Nick

22  Henderson.  I'm just going to ask a few questions to

23  follow up on the questions that Ms. DuBay asked.

24      Would you agree that there have been some

25  failures on making sure everything has been fully

IBA
SYMONDS
&DUNN
(503) 224-4438
Case 19-31883-dwh11   Doc 273   Filed 07/28/20

EXHIBIT 1
Page 18 of 80

1  disclosed in your bankruptcy schedules, include -- such

2  as the personal guarantee that Ms. DuBay was asking

3  about?

4      A.  Yes.

5      Q.  Did you intend to omit those -- that information

6  from your schedules?

7      A.  No.

8      Q.  Okay.  Why was the -- why were those things

9  omitted from your bankruptcy schedule, if I can ask?

10     A.  It's part of LLC business that didn't have

11  anything to do with the bankruptcy.

12     Q.  So was it your understanding that the LLC's

13  information didn't need to be disclosed in the

14  bankruptcy schedules for your personal case?

15     A.  Correct.

16         MR. ORR:  Objection, leading.

17             (Inaudible interruptions)

18         THE COURT:  Please, Mr. Dinihanian.  When I

19  speak, you need to stop until I've made a ruling.

20     I'm going to sustain the objection as a leading

21  question, so please restate the question.

22     Q.  (By Mr. Henderson)  So I'm trying to understand

23  your last response where you said that you thought that

24  they didn't need to be disclosed.  Why is that,

25  Mr. Dinihanian?  Why did you think that the information

IBA
SYMONDS
&DUNN
(503) 224-4438
Case 19-31883-dwh11   Doc 273   Filed 07/28/20
EXHIBIT 1
Page 19 of 80

1   did not need to be disclosed in your personal case?

2       A.   Because it is part of an LLC that is not included

3   in the bankruptcy.

4       Q.   As we're discussing this now, do you think that

5   the information needs to be included in your schedules

6   and amendments need to be filed?

7       A.   No.

8       Q.   Would you be willing to file a limited schedule

9   if that's what the Court requires you do to complete

10  this information?

11      A.   No.

12      Q.   But you would be willing to comply with any court

13  order; correct?

14      A.   Correct.

15      Q.   Mr. Dinihanian, do you believe that the

16  bankruptcy schedules and the bankruptcy paperwork you've

17  been asked to complete in this case have been

18  complicated and difficult to understand?

19           MR. ORR:  Objection, leading.

20      A.   Yes.

21           THE COURT:  Mr. Dinihanian, I need to ask

22  you to not speak after you hear Mr. Orr or any other

23  lawyer make an objection.

24           So an objection was stated; I'm going to sustain

25  the objection.  That's a leading question.

IBA
SYMONDS
&DUNN
(503) 224-4128
Case 19-31883-dwh11   Doc 273   Filed 07/28/20

EXHIBIT 1
Page 20 of 80

 1          Mr. Henderson, go ahead.

 2     Q.   (By Mr. Henderson)  Mr. Dinihanian, how would you

 3   describe the bankruptcy schedules and paperwork you've

 4   been asked to complete in this case?

 5     A.   Very confusing, and I don't know anything about

 6   them, but I'm just doing the best that I can.

 7              MR. HENDERSON:  Your Honor, based on

 8   Ms. DuBay's direct examination, I don't have any further

 9   questions.

10              THE COURT:  Thank you.

11          Ms. DuBay, anything else for this witness?

12              MS. DUBAY:  Not from me, your Honor, but I

13   understood that Mr. Orr might have some questions.

14              MR. ORR:  Yes, your Honor.

15              THE COURT:  Okay.  Mr. Orr?

16              MR. ORR:  Thank you.

17

18                   RECROSS-EXAMINATION

19   BY MR. ORR:

20     Q.   Mr. Dinihanian, how many LLCs do you have an

21   interest in?

22              THE COURTROOM DEPUTY:  Excuse me.  This is

23   the courtroom deputy.  Mr. Orr, you're very muffled and

24   I can't --

25              MR. ORR:  I'm sorry.

IBA
SYMONDS
&DUNN
(503) 224-4438
Case 19-31883-dwh11    Doc 273    Filed 07/28/20

EXHIBIT 1
Page 21 of 80

1      THE COURTROOM DEPUTY:  Thank you.

2      Q.  (By Mr. Orr)  Mr. Dinihanian, how many LLCs do

3   you have an interest in?

4      A.  I don't know the exact number.

5      Q.  You don't know the exact number?

6      A.  Correct.

7      Q.  And what kind of business are most of your LLCs

8   engaged in?

9      A.  Real estate.

10      Q.  And do you consider yourself a sophisticated real

11   estate investor?

12      A.  I do.

13      Q.  And are real estate transactions complicated?

14      A.  They are.

15      Q.  And you engage often in 1031 exchanges; I think

16   you mentioned one earlier tonight -- this morning.

17   That's part of your --

18      A.  Correct.

19      Q.  -- the business that you're -- that's part of how

20   you do your real estate investing; is that correct?

21      A.  Correct.

22      Q.  And those are pretty complicated transactions at

23   times, isn't that accurate?

24      A.  Correct.

25      Q.  Okay.  And so you've been asked to file -- you

IBA
SYMONDS
&DUNN
(503) 224-4138
Case 19-31883-dwh11    Doc 273    Filed 07/28/20

EXHIBIT 1
Page 22 of 80

1   were asked to sign schedules for this bankruptcy for the

2   LLC 15005 Northwest Cornell.  You signed those, the

3   petitions and the schedules and statements of affairs;

4   correct?

5       A.  Correct.

6       Q.  And how many -- and what -- and that LLC has an

7   interest in just some -- some farmland; correct?

8       A.  Correct.

9       Q.  And you repeatedly, though, filed signed

10  schedules -- signed the petitions stating that you were

11  a member of that LLC.  And that -- and even though

12  you're a sophisticated real estate developer, an

13  investor I should say, you now claim that you signed

14  those -- the petitions for that LLC misunderstanding

15  your role in that LLC; is that what you're trying to

16  tell the court?

17          MR. HENDERSON:  Objection, your Honor.

18  Argumentative.

19          THE COURT:  I'll allow the question.  I'm

20  going to overrule the objection.

21      You may answer the question, Mr. Dinihanian.

22          THE WITNESS:  I believe that I'm the member

23  manager, the managing member.  I'm the sole member of

24  that LLC and I manage the LLC.

25      Q.  (By Mr. Orr)  And you think -- and you're the

IBA
SYMONDS
&DUNN
(503) 224-4428

EXHIBIT 1
Page 23 of 80

Case 19-31883-dwh11    Doc 273    Filed 07/28/20

1    member of that LLC because you also control Eagle

2    Holdings, and Eagle Holdings is -- you use Eagle

3    Holdings for your own financial -- your personal

4    financial activities; correct?

5        A.   Correct.

6        Q.   And so, basically, Eagle Holdings pays for almost

7    all of your personal expenses; correct?

8        A.   Correct.

9        Q.   And that took place before the bankruptcy was

10   filed and it just continued; correct?

11       A.   Correct.

12       Q.   And the income that you get; like, for example,

13   in May, according to your financial report, you received

14   about $1500 from Eagle Holdings, and you used that to

15   pay some incidental expenses.  But basic -- but Eagle

16   Holdings basically is your company, it's you, you

17   operate it for your own personal benefit; correct?

18       A.   I operate it for the benefit of Eagle Holdings,

19   LLC.

20       Q.   But you pay all of your bills out of Eagle

21   Holdings; isn't that correct?

22       A.   Correct.

23       Q.   Okay.  But the income and -- but the income that

24   Eagle Holdings receives from the various LLCs, you don't

25   report that income in the filings that you file with

IBA
SYMONDS
&DUNN
(503) 224-4438
Case 19-31883-dwh11    Doc 273    Filed 07/28/20

EXHIBIT 1
Page 24 of 80

1  the -- with the court; correct?

2     A.  I believe I've filed everything correctly.

3     Q.  Well, but the in -- the -- you don't reflect --

4  you don't file anything with the court that shows the

5  income that Eagle Holdings receives; isn't that correct?

6     A.  Correct.

7     Q.  You only file financing -- financial statements

8  that show the income for the little bit of cash that

9  Eagle Holdings provides to you to pay certain utilities

10 and other charges associated with your personal

11 residence; isn't that correct?

12    A.  Correct.

13    Q.  Everything else you do, gas, trips, cars, all

14 that's -- that's all done through Eagle Holdings?

15    A.  Correct.

16    Q.  But, again, you don't disclose to the court in

17 any of the -- you've not disclosed to the court in any

18 other filings the income that you receive on a monthly

19 basis that is received by Eagle Holdings; isn't that

20 correct?

21    A.  Correct.

22    Q.  And when you -- and were you paid -- sorry.  If I

23 could direct your attention to the -- let's see.  It is

24 the stipulated facts, that document.

25    A.  On which document?

IBA
SYMONDS
&DUNN
(503) 224-4438
Case 19-31883-dwh11    Doc 273    Filed 07/28/20

EXHIBIT 1
Page 25 of 80

 1     Q.   The stipulated facts.  I think you've got that

 2   with you.

 3     A.   On -- Is that part of the declaration?

 4     Q.   Not part of your declaration.  But do you have

 5   that document?  Do you have the stipulated facts?

 6     A.   I don't have it up.  I don't have it up on my

 7   computer right now.  I -- yeah.

 8     Q.   If you could pull that up.

 9     A.   Stipulated facts.  I don't know.  I don't have

10   that available to me right now.

11          MR. HENDERSON:  Your Honor, this is Nick

12   Henderson.

13          THE COURT:  Hold on a second.

14        Go ahead, Mr. Henderson.

15          MR. HENDERSON:  If it would please the

16   Court, I can send Mr. Dinihanian an e-mail with that

17   document attached.  I just want to make sure I won't

18   communicate anything else to him other than getting him

19   that document.

20          THE COURT:  Okay.  Mr. Orr, are you going to

21   ask questions about that document?

22          MR. ORR:  Yes, sir.  That would be fine.  I

23   have no objection.  I thought that was already done,

24   so --

25          THE COURT:  I thought that I had expressed

IBA
SYMONDS
&DUNN
(503) 224-4428
Case 19-31883-dwh11   Doc 273   Filed 07/28/20

EXHIBIT 1
Page 26 of 80

 1  an expectation that would be done; so go ahead and do

 2  that, Mr. Henderson.

 3              (Pause in the proceedings)

 4              MR. HENDERSON:  I apologize for the delay,

 5  your Honor.  I'm still working on it.  The files are

 6  very large.  For the record, these were sent, but I'm

 7  just trying to make these easily accessible to

 8  Mr. Dinihanian.

 9              THE COURT:  Understood.  Go ahead.

10              MR. HENDERSON:  Okay.  Those documents have

11  been sent, Mr. Dinihanian.

12         Provided they show up on his end, he should be

13  able to answer questions about those in just a minute.

14              THE COURT:  While we're waiting,

15  Mr. Henderson, did you just send the entirety of Docket

16  item 250 or did you send in parts or what?

17              MR. HENDERSON:  I sent the entirety of

18  Docket 250.

19              THE COURT:  Thank you.

20              (Pause in the proceedings)

21              MR. HENDERSON:  Mr. Dinihanian, did you get

22  the e-mail from me with the link to the documents?

23              THE WITNESS:  I got the link and I said yes

24  to the request and I haven't received the documents yet.

25              THE COURT:  Why don't we go ahead and go off

IBA
SYMONDS
&DUNN
(503) 224-4128
Case 19-31883-dwh11    Doc 273    Filed 07/28/20

EXHIBIT 1
Page 27 of 80

1 the record and go ahead and use this opportunity to take

2 a break until 10:15.  Then that will avoid the need to

3 do one at 10:30; so let's take a break now.

4        And, Mr. Dinihanian, you can make sure that you

5 do what you need to do with Mr. Henderson, communicating

6 only about this exhibit to make sure that you receive it

7 and have it up and ready to go at 10:15.

8        So, with that, we're adjourned until 10:15.

9              [RECESS]

10       THE COURT:  Good morning.  We're back on

11 record on 15005.  Do we have Mr. Henderson?

12             MR. HENDERSON:  Yes, your Honor.

13             THE COURT:  Mr. Pahl?

14             MR. PAHL:  Yes, your Honor.

15             THE COURT:  Ms. DuBay?

16             MS. DUBAY:  Yes, your Honor.

17             THE COURT:  Mr. Orr?  Bruce Orr?

18       Mr. Steinberg?

19             MR. STEINBERG:  Yes, your Honor.

20             THE COURT:  Mr. Dinihanian?  Is

21 Mr. Dinihanian on?

22       Is Mr. Orr on?

23             MR. ORR:  I snuck in, your Honor.  Thank

24 you.  Sorry.

25             THE COURT:  Okay.  Mr. Dinihanian?

IBA
SYMONDS
&DUNN
(503) 224-4438
EXHIBIT 1
Page 28 of 80
Case 19-31883-dwh11   Doc 273   Filed 07/28/20

 1         Mr. Henderson, can you text or call him to see
 2    what the situation is?
 3              MR. HENDERSON:  Yes, your Honor.  I'll do
 4    that right now.
 5                   (Pause in the proceedings)
 6              MR. HENDERSON:  Mr. Dinihanian reports that
 7    he's on the call.
 8         Mr. Dinihanian, can you hear me?
 9              THE COURT:  Mr. Dinihanian, are you -- do
10    you have your phone muted?
11              MR. HENDERSON:  I'm going to ask him to hang
12    up and dial back in.
13              THE COURT:  Thank you.
14                   (Pause in the proceedings)
15              THE WITNESS:  Okay.  I should be on now.
16    Okay.
17              THE COURT:  Thank you.
18         Do we have Mr. Henderson back?
19              MR. HENDERSON:  I apologize, your Honor.  I
20    think Mr. Orr was asking questions, and I've given
21    Mr. Dinihanian the stipulation -- (inaudible) -- facts.
22              THE COURT:  Very good.  I think everyone's
23    on now.
24         Mr. Orr, you may proceed.
25              MR. ORR:  All right.  Thank you.

IBA
SYMONDS
&DUNN
(503) 224-4428
Case 19-31883-dwh11    Doc 273    Filed 07/28/20

EXHIBIT 1
Page 29 of 80

 1                    RECROSS-EXAMINATION
 2   BY MR. ORR:  (Continuing)
 3      Q.  Mr. Dinihanian, would you -- I think you now have
 4   the stipulated facts; is that correct?
 5      A.  Yes, I do.
 6      Q.  All right.  I'd like you to turn to -- it's --
 7   there are apparently 494 pages in that document.  The
 8   29th page, it is Exhibit 1.  Exhibit 1, page 17 of
 9   Exhibit 1.
10             THE COURTROOM DEPUTY:  Mr. Orr, will you
11   pick up the handset?  You're kind of --
12             MR. ORR:  Sorry.  Sorry, I -- I'm sorry.
13   Yeah, okay.
14             THE WITNESS:  Yes.  Excuse me.  What page
15   was that on?
16      Q.  (By Mr. Orr)  It is Exhibit 1, page 17.  It's
17   the -- the entire document, apparently it's the 29th
18   page.
19             MR. HENDERSON:  This is Nick Henderson.  If
20   I could offer some guidance to Mr. Dinihanian, there are
21   three documents that comprise Docket entry 250.  This
22   would be in Docket 250-1.
23             THE WITNESS:  Okay.
24             MR. HENDERSON:  Which starts with Exhibit 1
25   on page 1.

                        IBA
                     SYMONDS
                      &DUNN
                   (503) 224-4428
        Case 19-31883-dwh11   Doc 273   Filed 07/28/20

                                          EXHIBIT 1
                                          Page 30 of 80

1            THE WITNESS:  Okay.  I think I have the

2    right page now.

3        Q.  (By Mr. Orr)  All right.  At the bottom of the

4    page, does it say "General Judgment of Dissolution of

5    Marriage"?

6        A.  Yes.

7        Q.  All right.  And are you familiar with that

8    document?

9        A.  I haven't looked at this document for a long

10   time, but I have the page that you're requesting up on

11   my computer right now.

12       Q.  Okay.

13           THE COURTROOM DEPUTY:  Mr. Dinihanian, also

14   if you're on a speaker phone, you're kind of faint.  If

15   there's something you can do to get closer to the

16   handset.  Thank you.

17           THE WITNESS:  Okay.  Is that better?

18           THE COURTROOM DEPUTY:  Yes.  Thank you.

19       Q.  (By Mr. Orr)  All right.  So I'm looking at -- do

20   you have -- it's paragraph 12 and it says 15005 Cornell

21   Road?

22       A.  Correct, yes.

23       Q.  All right.  Okay.  And would you read for us all

24   of that first paragraph?

25       A.  "Husband shall sell his interest in the property

IBA
SYMONDS
&DUNN
(503) 234-4438

Case 19-31883-dwh11    Doc 273    Filed 07/28/20

EXHIBIT 1
Page 31 of 80

1    located at 15005 Northwest Cornell Road, Portland,

2    Washington County, Oregon, hereinafter called the

3    'farm,'" in quotes.  "Husband's interest in the farm for

4    purposes of this judgment means husband's ownership of

5    Eagle Holdings, LLC, which holds 50 percent of the

6    ownership interest in 15005 Northwest Cornell Road, LLC.

7    Eagle Holdings, LLC, is deemed have an ownership

8    interest in an undivided 25 percent interest in the

9    farm.  From his share of the sale of proceeds he shall

10   pay 2.25 million equalizing money award owed to wife.

11   See paragraph 13.B below."

12        Subparagraph A, "The" --

13     Q.  Let me stop --

14             (Inaudible interruptions)

15        THE COURT:  Hold on.  I don't think Mr. Orr

16   wanted you to read further.

17        So go ahead, Mr. Orr.

18        MR. ORR:  Yes.  Thank you, your Honor.

19     Q.  (By Mr. Orr)  The -- Do you recall -- do you have

20   an understanding of what the purpose of this paragraph

21   was, after reading this?

22     A.  I don't know what your question would be.

23     Q.  Well, in the first -- in this paragraph, you are

24   the "husband"; correct?

25     A.  Correct.

IBA
SYMONDS
&DUNN
(503) 224-4438
Case 19-31883-dwh11    Doc 273    Filed 07/28/20

EXHIBIT 1
Page 32 of 80

1    Q.  Okay.  And in this paragraph, is it your

2    understanding that you said that you shall sell your

3    interest in the property located at -- well, the farm?

4    A.  Correct.

5    Q.  Okay.  And then the next sentence tries to define

6    what husband's interest in the farm is; is that correct?

7    A.  Correct.

8    Q.  Is that your understanding?

9    A.  Correct.

10   Q.  All right.  And then for purposes of this

11   judgment, it -- it was -- the husband's interest in the

12   farm means, according to this, quote, "husband's

13   ownership of Eagle Holdings, LLC, which holds 50 percent

14   of the membership interest in 15005 Northwest Cornell,

15   LLC"; is that correct?  Is that what it says?

16   A.  That's what it says.

17   Q.  Okay.  Now, Eagle Holdings had 50 percent of the

18   membership interest and the trust at this time held,

19   prior to this judgment being entered, held 50 percent

20   of -- the other 50 percent of the interest in that 15005

21   Northwest Cornell, LLC; correct?

22   A.  Correct.

23   Q.  All right.  And then -- so the -- so for purposes

24   of this agreement, your interest in the farm was the

25   equivalent of the LLC's interest, membership interest in

IBA
SYMONDS
&DUNN
(503) 224-4438
Case 19-31883-dwh11   Doc 273   Filed 07/28/20

EXHIBIT 1
Page 33 of 80

1   the LLC, 15005 Northwest Cornell, LLC; correct?

2       A.   That's what it says, yes.

3       Q.   Okay.  And that's your understanding of what you

4   intended when you signed this; correct?

5       A.   Correct.

6       Q.   And then the next sentence says "Eagle Holdings

7   is deemed to have an ownership interest in an undivided

8   25 percent interest in the farm."

9            So in that sentence, then, you agreed that Eagle

10  Holdings would be deemed to have not just an interest in

11  the LLC, but in the dirt itself, in the -- in the

12  undivided interest in the farm; correct?

13      A.   Correct.

14      Q.   Okay.  So Eagle Holdings; that is you, were only

15  to -- under this agreement, were to receive 25 percent

16  interest in the dirt; correct?

17      A.   That's what it says.

18      Q.   Well, that's -- that's your understanding of

19  this -- that provision; correct, that paragraph?

20      A.   Correct.

21      Q.   And the other 25 percent of the interest in the

22  farm was in the name of 15005 Northwest Cornell, the

23  other 25 percent was to go to the trust; correct?  That

24  was your agreement?

25      A.   It is to go to a trust, correct.

IBA
SYMONDS
&DUNN
(503) 224-4438
EXHIBIT 1
Page 34 of 80
Case 19-31883-dwh11    Doc 273   Filed 07/28/20

1      Q.   Well, your daughter's trust, the trust you

2   established for your daughter that you mentioned and

3   described in your declaration that you filed for this

4   hearing; correct?

5      A.   Correct.

6      Q.   So it's that trust?

7      A.   That trust.

8      Q.   Not some other trust; correct?  Correct?

9      A.   Correct, correct.

10     Q.   All right.  And so the trust was to receive, if

11  there was going to be a sale, the trust would receive 25

12  percent of the proceeds -- you know, half of the

13  proceeds for that interest in the property.  But if the

14  property was sold, your half, your 25 percent interest

15  in the dirt would go to you and then to pay off your

16  wife, soon to be ex-wife, and the other 25 percent, the

17  other 25 percent of the value of the dirt, or 50 percent

18  of the interest in the LLC, that was to go to the trust;

19  correct?

20     A.   Correct.

21     Q.   And you want -- you and your wife agreed that to

22  protect the trust this is how the interest in the dirt

23  in the farm was to be divided up; correct?

24     A.   Correct.

25     Q.   And you also agreed in this judgment that if the

IBA
SYMONDS
&DUNN
(503) 224-4438
Case 19-31883-dwh11    Doc 273    Filed 07/28/20

EXHIBIT 1
Page 35 of 80

1  property couldn't be sold to -- if the other members,

2  the other tenants in common with regard to the interest

3  in the farm, if they weren't interested in buying your

4  interest in the farm, that you would then execute a deed

5  to convey to the trust a 25 percent interest in the

6  farm; correct?

7       A.   If they agreed --

8       Q.   That's what you said in your --

9       A.   Yeah.

10      Q.   That's what you've said in your declaration.

11      A.   If they agreed, but they didn't agree.

12      Q.   They didn't agree to buy it.  And because they

13  didn't agree to buy it, the next step was for you then

14  to give a deed to the trust for the 25 percent interest

15  in the farm; correct?

16      A.   Well, they would have had to agree to buy it or

17  they would have had to agree to go by our business

18  agreement which says that we sell the property and

19  divide the money, and we go forward from there.  And

20  they're voting against their own agreement.

21      Q.   No.  What I'm asking about what your obligation

22  was if -- if the other tenants in common that held an

23  interest in the farm did not agree to buy the -- your

24  interest in the farm, then you were obligated to do

25  your -- you were obligated to deliver the deed to the

IBA
SYMONDS
&DUNN
(503) 224-4128

EXHIBIT 1
Page 36 of 80

Case 19-31883-dwh11    Doc 273    Filed 07/28/20

1  trust; correct?

2      A.  Well, I couldn't deliver it to -- it was 15005

3  Northwest Cornell, LLC, and that's not legally possible.

4      Q.  Well, that's not what I'm asking.  I'm asking

5  if -- if you -- if you dis -- if you agree that you were

6  obligated, that you promised to deliver the deed to the

7  trust.

8      A.  Well, if I promised to do something illegal, I'm

9  sorry, but I couldn't -- I couldn't agree to transfer an

10 interest that an LLC owns.  The LLC would have to do it,

11 and it's not possible to do that.

12     Q.  Well, this judgment provides that, in fact, for

13 purposes of the judgment, you -- you have -- you held

14 the interest of Eagle Holdings, and Eagle Holdings had

15 the interest of -- in -- your -- or a quarter interest

16 in the dirt.

17     A.  Correct.

18     Q.  Eagle Holdings would be deemed to have an

19 ownership interest in an undivided 25 percent interest

20 in the farm; that is, the dirt?

21     A.  Correct.

22     Q.  Okay.  So if you go to the next page of that

23 document, so it's paragraph 12B, and it says that is

24 where your promise is to deliver -- it says that

25 husband -- that's you, right? -- shall cause the Cornell

IBA
SYMONDS
&DUNN
(503) 224-4438
Case 19-31883-dwh11    Doc 273    Filed 07/28/20

EXHIBIT 1
Page 37 of 80

1  Road, LLC, to provide the other owners of the farm with

2  a written offering notice as provided in the tenant in

3  common agreement that you had; correct?

4     A.  Correct.

5     Q.  All right.  And then you did do that; correct?

6     A.  Could you repeat the question?

7     Q.  You did do what's set out in the first sentence

8  of paragraph B there, that's what you did perform, that

9  part of your promise?

10     A.  "Within ten days of the entry of this judgment

11  husband shall cause 15005 Northwest Cornell to provide

12  the other owners of the farm with a written offering

13  of" -- correct, I did that three times.  Correct.

14     Q.  All right.  That might not have been within ten

15  days, but you did do that, okay.  And you did that on

16  behalf of LLC 15005 Northwest Cornell; correct?

17     A.  I'd have to go back and look at the documents and

18  see how it's written, but I did offer --

19     Q.  But nevertheless --

20     A.  -- I did offer them, yes.

21     Q.  Yes, you did --

22     A.  I did offer them to buy me out, if that's what

23  you're asking.

24     Q.  And then --

25     A.  They --

IBA
SYMONDS
&DUNN
(503) 224-4138
Case 19-31883-dwh11    Doc 273    Filed 07/28/20

EXHIBIT 1
Page 38 of 80

1      Q.   -- they did not accept it, right?

2      A.   No.  They didn't even respond.  Three times I

3  offered, yeah.

4      Q.   All right.

5      A.   Over the course of a year.

6      Q.   Then the next sentence in that paragraph B says

7  if -- if none of the owners accepts and consummates the

8  deal, the offer, it then says then, quote, "husband,"

9  that's you, "shall promptly, one, cause 15005 Northwest

10 Cornell, LLC, to execute and deliver to the trust a

11 statutory warranty deed conveying an undivided and

12 unencumbered 25 percent interest in the farm in exchange

13 for Sonja's membership interest in 15005 Northwest

14 Cornell, LLC."

15     A.   That's -- that's what it says, correct.

16     Q.   Okay.  So in your declaration that you filed with

17 the court you said there wasn't -- you were -- there was

18 no consideration for this promise to deliver the deed to

19 the trust.  This document that you signed in the state

20 court says the consideration will be the exchange of the

21 trust interest in the LLC, 15005 Northwest Cornell, LLC;

22 correct?

23     A.   Correct.

24     Q.   All right.  So your declaration is inaccurate,

25 would you agree?

IBA
SYMONDS
&DUNN
(503) 224-4438
EXHIBIT 1
Page 39 of 80
Case 19-31883-dwh11    Doc 273    Filed 07/28/20

1      MR. HENDERSON:  Objection, your Honor.  I
2  think it calls for a legal conclusion.
3      THE COURT:  I'll overrule the objection.
4  The witness should answer it.
5      THE WITNESS:  Correct.  I believe that
6  there's a legal discrepancy in the document itself and
7  that I couldn't proceed legally.
8      MR. ORR:  I'll follow in Ms. DuBay's -- I
9  would object, your Honor, to that response as
10  nonresponsive.
11     Q.  (By Mr. Orr)  Isn't it accurate, Mr. Dinihanian,
12  that this document says that you're going -- the deed
13  will be delivered, you will cause the LLC to deliver the
14  deed in exchange for the trust interest in the LLC 15005
15  Northwest Cornell?
16     A.  That's what it says, but I don't think that I can
17  legally -- I didn't think that I could legally do that.
18     Q.  But if the deed was delivered, then the trust
19  would no longer have an interest in the LLC and you,
20  Eagle Holdings, would have 100 percent interest in the
21  LLC, 15005 Northwest Cornell, LLC; correct?
22     A.  Well, I would have to look into the legality of
23  that.
24     Q.  Well, whether it's -- that's what the agreement
25  was.  I'm just trying to make sure I understand, you

IBA
SYMONDS
&DUNN
(503) 224-4438
Case 19-31883-dwh11    Doc 273    Filed 07/28/20
EXHIBIT 1
Page 40 of 80

1  know, that you don't have -- you don't disagree that

2  that is what the agreement was, that that's the way this

3  document should be interpreted, this judgment.

4      A.  I'm just trying to do the best I can with the

5  legality of everything.  And I don't know.  If --

6      Q.  You're not a lawyer, are you?

7      A.  I don't know if I was legally --

8      Q.  The question for you is a question of your

9  understanding of this document and whether you disagree

10  that, in fact, if you deliver the deed, then the trust

11  would no longer be -- have an interest in the LLC, and

12  that was -- that giving up that interest would be in

13  exchange for the deed; so the financial interest of the

14  LLC would be -- of 15005 Northwest Cornell wouldn't

15  change.  There would be no -- that entity -- that

16  financial interest in the dirt wouldn't change.  It

17  would still have an interest in 25 percent of the dirt.

18      A.  Well, Mr. Bittner wrote up the document.  And my

19  attorney at the time was Robert Scherzer.  And I went

20  through the document with Robert Scherzer and I marked

21  through all the paragraphs that I would not agree to

22  because I needed to change some things.  And he stated

23  to me that I couldn't have any more time, he couldn't

24  get me any more time with my daughter unless I just

25  signed it the way that it was.

IBA
SYMONDS
&DUNN
(503) 224-4438

Case 19-31883-dwh11    Doc 273    Filed 07/28/20

EXHIBIT 1
Page 41 of 80

1    Q.   But you signed this document; correct?

2    A.   Under a lot of duress and very concerning Oregon

3  divorce people, yeah.

4    Q.   Well, your argument now is that your lawyer

5  strong-armed you into this?

6    A.   Well, one of the reasons why I changed attorneys

7  to Dan Lorenz was because Dan Lorenz identified

8  malpractice of Robert Scherzer.

9    Q.   About this provision?

10   A.   Yes.

11   Q.   Isn't it true -- isn't it true, Mr. Dinihanian,

12 that prior to you signing the trust deeds with -- and

13 signing this document, you had a separate real estate

14 lawyer review the proposed terms of the judgment,

15 including granting the trust deeds to your wife to

16 secure the monetary obligations that you had to her?

17 Isn't -- didn't you ask that of a different real estate

18 lawyer, and that lawyer gave an opinion?  And after

19 that, after you got that opinion, you still went ahead

20 and signed this document?

21   A.   I was just relying on the --

22   Q.   Isn't that true?

23   A.   I was relying on Robert Scherzer.

24   Q.   Isn't it true that you had a real estate -- a

25 separate real estate lawyer review the aspects about the

IBA
SYMONDS
&DUNN
(503) 224-4438
Case 19-31883-dwh11    Doc 273    Filed 07/28/20

EXHIBIT 1
Page 42 of 80

1  real estate and granting an interest in the dirt to your

2  wife as part of this divorce decree?

3      A.  I don't recall all the people that I, you know --

4  if I had somebody other than Robert Scherzer who I would

5  rely on for divorce law decisions, I wouldn't remember

6  who that was.

7      Q.  Have you seen the declaration from -- I'm going

8  to butcher her last name -- Amy Fassler that was

9  delivered to you?

10     A.  I don't have that in front of me.

11     Q.  You don't have that document in front of you.

12 Well, it was delivered the other day and we asked that

13 it be presented to you so we could question you about

14 it.

15     A.  Okay.

16     Q.  That document has not been delivered to you?

17     A.  I think --

18             MR. HENDERSON:  Mr. Dinihanian?

19             THE WITNESS:  Yes.

20             MR. HENDERSON:  If I may, it's one of the

21 e-mails you received yesterday from Mr. Pahl.

22             THE WITNESS:  Okay.  All right.  You want me

23 to switch off of this screen and go over to that screen

24 and pull that up?

25     Q.  (By Mr. Orr)  In just one minute.  I want to go

IBA
SYMONDS
&DUNN
(503) 224-4438
Case 19-31883-dwh11   Doc 273   Filed 07/28/20

EXHIBIT 1
Page 43 of 80

1    back to this once, just a little bit more here.

2         Isn't it true, sir, that you really have no

3    intent -- you understand the goal of this -- what do you

4    understand the goal of Chapter 11 bankruptcy to be for

5    the LLC 15005 Northwest Cornell?

6    A.   Well, I have an understanding that 15005

7    Northwest Cornell Road, LLC, is the LLC that owns the

8    interest in the Cornell Road property.  And that we have

9    this judgment decree that says that I -- I owe out of

10   the sale of that property two and a quarter million, and

11   that I was going to either sell that -- sell my part of

12   that property to my partners or I would go by our

13   business agreement, which says that we -- if they don't

14   want to buy it, then we go ahead and sell it, sell the

15   property, we divide our money, and go forward with

16   paying our own bills.  And that's what I had intended to

17   do in mediation on the 5th of January of 2015 with the

18   mediator -- I can't remember his name right now, but

19   that's what I agreed to -- that's what I was going to

20   do.  And then none of that could happen and it still

21   hasn't happened, and it's very -- it's causing me a lot

22   of stress because I'm having a difficult time going all

23   this time without getting anything accomplished.

24   Q.   What do you understand the purpose of Chapter 11

25   to be?

IBA
SYMONDS
&DUNN
(503) 224-4438
EXHIBIT 1
Page 44 of 80
Case 19-31883-dwh11    Doc 273    Filed 07/28/20

1      A.   The purpose of the Chapter 11 is for me to -- to

2  state a plan for paying off debt, and that's what I have

3  done.

4      Q.   Isn't -- isn't it correct that you have no

5  intention of proposing a plan of reorganization for

6  15005 Northwest Cornell that proposed the terms of the

7  general judgment; particular paragraph B -- I'm sorry,

8  12, and specifically 12B?

9      A.   Well, I think I've done everything legally and

10  correctly.  I've obtained a lender now, Sortis Capital,

11  who will loan the money --

12      Q.   We'll talk about that in a minute.  But my

13  question is -- my question is whether or not you --

14  isn't it true that you have no intention at all of

15  proposing a plan that fulfills the terms of paragraph B,

16  12B of the general judgment, that says that you're to

17  deliver a deed to the trust in exchange for the trust

18  interest in the LLC?  You would never propose a plan

19  that does that; correct?

20      A.   I can only do what I legally can do and I have to

21  be --

22      Q.   No.

23      A.   -- advised by my legal professionals of what I

24  can do and what I can't do.

25      Q.   Okay.  And you've been told you can't do that?

IBA
SYMONDS
&DUNN
(503) 224-4138
Case 19-31883-dwh11    Doc 273    Filed 07/28/20

EXHIBIT 1
Page 45 of 80

 1              MR. HENDERSON:  Objection, your Honor.  I

 2     would call --

 3              THE COURT:  Sustained, sustained.  Don't

 4     answer the question.

 5          Go ahead, Mr. Orr.

 6     Q.  (By Mr. Orr)  What I'm asking you, sir, is what

 7     your intention is.  And my -- and is it not correct that

 8     you have no intention to file a plan that provides for

 9     the delivery or is based upon the delivery of a deed to

10     the trust for 25 percent of the interest in the farm in

11     exchange for -- in exchange for Sonja's -- the trust

12     interest in that LLC, 15005 Northwest Cornell?

13              MR. HENDERSON:  Objection, your Honor.  He's

14     been asked and answered.

15              MR. ORR:  No, he hasn't answered it, sir.

16              MR. HENDERSON:  Your Honor, if I may --

17              THE COURT:  I don't think he's answered it.

18          So, Mr. Dinihanian, you can answer the question

19     now.

20              THE WITNESS:  I have answered.  I can only

21     do what I'm legally -- what I legally can do.  I can't

22     do something that I legally can't do.

23              MR. ORR:  Well, your Honor, I need to ask

24     him about what he thinks that he legally can do or can't

25     do, or he -- please ask him to answer -- direct him to

IBA
SYMONDS
&DUNN
(503) 224-4438
EXHIBIT 1
Page 46 of 80
Case 19-31883-dwh11   Doc 273   Filed 07/28/20

1  answer my question.

2                (Inaudible interruptions)

3          THE COURT:  Okay.  His answer is he can't do

4  something that he can't legally do, then it's fair game

5  for Mr. Orr to ask him what the basis is for his

6  understanding of the limitations on what he can do

7  legally.

8          So, Mr. Dinihanian, you can answer that question.

9          THE WITNESS:  Well, 15005 Northwest Cornell,

10 LLC, would have to do the transfer, and it legally can't

11 do that.  That's to answer your question.

12    Q.  (By Mr. Orr)  And why legally can it not do that?

13 What's your understanding as to why it legally cannot do

14 that?

15    A.  Well, it's an LLC.

16    Q.  And that means what?

17    A.  That means that it -- it's not a human.  It's not

18 a person.  It can't sign documents.  I mean it can't

19 transfer a property.

20    Q.  It can't transfer property?

21          THE COURT:  At this stage, I'm going to

22 intervene.  And I'm trying to be cautious and threading

23 a needle between allowing legitimate inquiry into the

24 witness's understanding of and how -- understanding of

25 an historical act to perform or not perform.  But when

IBA
SYMONDS
&DUNN
(503) 224-4438
Case 19-31883-dwh11   Doc 273   Filed 07/28/20

EXHIBIT 1
Page 47 of 80

1   we get into the weeds of querying him on the law, then

2   that's where I think it's unhelpful of asking him to

3   opine in the law.

4        So I would ask you, Mr. Orr, to direct your

5   questions to his, again, his understanding of what he's

6   obligated to do and whether or not he's done it and

7   plans to do it, but not his understanding of how the law

8   applies to it.

9             MR. ORR:  Thank you.

10   Q.  (By Mr. Orr)  Mr. Dinihanian, do you plan to

11   comply with the terms of the general judgment,

12   specifically paragraph 12B?

13   A.  I plan to comply with my Chapter 11, the way I

14   laid it out, my plan of, you know, paying off debt.

15   Q.  And the plan that you propose, although

16   apparently it's being withdrawn, the plan that you did

17   file did not provide for the trust to receive a deed to

18   a 25 percent interest in the farm in exchange for the

19   trust interest in the LLC; correct?

20   A.  Correct.

21   Q.  And, in fact, the plan that you proposed and the

22   financing you proposed actually would put the trust

23   interest in the dirt at greater risk than it would be if

24   you complied with the judgment, the general judgment;

25   isn't that correct?

1       A.   I don't know if that would be true or not.

2       Q.   Well, the plan you proposed provided -- provides

3   for financing to borrow -- well, at least the one that

4   was filed -- over $4 million; correct?

5       A.   I don't know what you're asking.  I have the

6   money.  I have the letter to pay your client off and

7   you're not accepting the money.

8       Q.   What's your understanding of what the lender has

9   proposed to lend?  How much is the lender proposed to

10  lend?

11      A.   The lender will pay the 2.25 and then we'll go

12  ahead and do a PUD on the property and we'll --

13      Q.   Sir, isn't that -- isn't the proposed loan that

14  was part of your plan and any of the other proposals

15  that you received, isn't the loan substantially greater

16  than just what it would take to pay off your ex-wife?

17      A.   Oh.  I don't know if I'm legally obligated to go

18  into what my business plans are, but I plan to pay your

19  client off, and that's what I'm legally obligated to do,

20  and I'll cooperate with you 100 percent.

21      Q.   You're representing to the court that you are

22  working on a plan that will pay all of your creditors,

23  the creditors of the LLC, as well as your personal

24  creditors; correct?

25           MR. HENDERSON:  Objection, your Honor.

IBA
SYMONDS
&DUNN
(503) 224-4128
Case 19-31883-dwh11    Doc 273    Filed 07/28/20

EXHIBIT 1
Page 49 of 80

1  Misstates the testimony.

2         THE COURT:  Mr. Orr, why don't you restate

3  that as a question?

4     Q.  (By Mr. Orr)  Mr. Dinihanian, have you put in

5  your declaration that you're trying -- you've talked to

6  a lender that would finance full payment to all of your

7  creditors; that being the credit -- meaning the

8  creditors of the LLC, as well as your personal

9  creditors?

10        MR. HENDERSON:  Objection, your Honor.

11 Again, it misstates the testimony.  If Mr. Orr wants --

12        THE COURT:  I'm going to deny that.  I think

13 Mr. Orr asked whether or not the declaration says

14 something.  And Mr. Dinihanian's got access to the

15 declaration; he signed it.  I think it's a fair

16 question; so I'm over ruling the objection.

17        MR. HENDERSON:  Your Honor, this is Nick

18 Henderson again.  If I could ask, could Mr. Dinihanian

19 be directed to look at the declaration for this

20 question?

21        THE COURT:  He's certainly welcome to look

22 at the declaration, but that wasn't specifically what

23 Mr. Orr's question was, and I'll allow Mr. Orr to put

24 the question again.

25        MR. ORR:  I have no objection if he wants to

IBA
SYMONDS
&DUNN
(503) 224-4138
Case 19-31883-dwh11    Doc 273    Filed 07/28/20

EXHIBIT 1
Page 50 of 80

1  look at his declaration.

2          THE WITNESS:  Okay.  Could you please --

3  okay.  Hold on.  Let me try to pull that up.  Okay.  I

4  have it now.  Could you go -- tell me what page?

5      Q.  (By Mr. Orr)  Well, I'm trying to find it,

6  actually.  Try paragraph 19.

7      A.  Okay.  I'm looking for it here.  Paragraph --

8  paragraph 19.  Okay.  I have the declaration.  "R E

9  Fassler Final" is a declaration of Amy Fassler.  Is that

10 the one?

11     Q.  No, sir.  This is your declaration, your

12 declaration.

13     A.  Oh, my declaration.  Okay.  Here we go.  Okay.

14 Paragraph -- which paragraph now?

15     Q.  Let's see.  Paragraph 19.

16     A.  Okay.  "From the beginning of these bankruptcy

17 cases, it has been my intention to repay all valid

18 claims in full, including the divorce judgment.  To that

19 end, I have worked" --

20          THE COURT:  I'm sorry, Mr. Dinihanian.  Hold

21 on a second here.  I'm going to -- I'm just

22 interrupting.  In order to move the process along, if

23 you need to refer to a paragraph, you can go ahead and

24 read it to yourself.  And I would ask that if a lawyer

25 asks you to refer to a paragraph, let's just allow the

IBA
SYMONDS
&DUNN
(503) 224-4438

EXHIBIT 1
Page 51 of 80

Case 19-31883-dwh11    Doc 273    Filed 07/28/20

1  witness to read it to himself; that way it will expedite
2  the process.
3         So, Mr. Orr, could you clarify the question
4  that's pending?
5               MR. ORR:  Yes.  So I would just --
6     Q.  (By Mr. Orr)  Mr. Dinihanian, would you look --
7  read paragraph 19.  Does that refresh your recollection
8  about the issue of financing that I was asking, asking
9  about?
10    A.  Thank you.  I'll do that right now.
11        Yes.  That's correct.
12    Q.  Okay.  So my question is the idea is to pay
13 through this financing your creditors, your personal
14 creditors, and any creditors of 15005, LLC?
15    A.  That's correct.
16    Q.  Okay.  So now -- so my question is -- and it
17 says, you know, that you've worked to gain the
18 commitment for finance.  So my question is how much?
19    A.  Well --
20    Q.  How much would it --
21    A.  -- it would depend on the --
22    Q.  What's that?  Sorry.  I interrupted you.  Sorry.
23    A.  It would be enough to pay your client off and
24 then an unknown amount to go further into, you know,
25 we'll need to do a PUD on the property and go forward

IBA
SYMONDS
&DUNN
(503) 224-4128
Case 19-31883-dwh11    Doc 273    Filed 07/28/20

EXHIBIT 1
Page 52 of 80

 1   with selling the property so that I could pay Sortis

 2   off.

 3             MR. PAHL:  Excuse me.  This is Doug Pahl.

 4   If I could just jump in, in aid of an objection, to

 5   clarify something here.

 6        Mr. Dinihanian, who do you believe Mr. Orr's

 7   client is, the lawyer who's asking you questions right

 8   now?

 9             THE WITNESS:  Tasha's lawyer.

10             MR. PAHL:  Yeah.  Mr. Orr, if you could just

11   clarify it for Mr. Dinihanian who you represent, I think

12   that would make the record clear here.

13        Q.  (By Mr. Orr)  I represent your daughter's trust,

14   sir; specifically, your ex-wife as the trustee of your

15   daughter's trust.

16        A.  Understood.

17        Q.  You knew that?

18        A.  Understood.

19        Q.  When you say "understood," you knew that all

20   along; correct?

21        A.  I understand, correct.

22        Q.  You under -- so the answer to my last question

23   was "correct"?

24        A.  Correct.

25        Q.  All right.  So the -- my question is how much

IBA
SYMONDS
&DUNN
(503) 224-4438
Case 19-31883-dwh11   Doc 273   Filed 07/28/20

EXHIBIT 1
Page 53 of 80

1   money do you understand Sortis Capital has committed to

2   provide to you?

3       A.   They have committed to pay off this judgment to

4   Tasha, two and a quarter million.

5       Q.   And no more than that?

6       A.   There would be an undisclosed amount to -- for

7   other things having to do with the property.

8       Q.   Well, it says it would be used, according to your

9   paragraph 19, it says the financing would be in the form

10  of a debtor-in-possession loan, it would be used to fund

11  all estate expenses, and a plan that would be used to

12  plan the (inaudible) reorganization, I think, to

13  develop -- there's maybe a word missing there, a plan of

14  reorganization developed at Cornell property.

15      A.   Correct.  That's correct.

16      Q.   So to fund all estate expenses includes your

17  personal bankruptcy, as well as the expenses of the LLC;

18  correct?

19      A.   Correct.

20      Q.   So I'm asking you again, sir, how much?  If

21  there's a commitment -- if there's a commitment for

22  funding, for financing, did not the lender say "We'll

23  lend up to X amount of dollars"?

24      A.   I think they'll be willing to fund whatever is

25  necessary to pay the judgment.

IBA
SYMONDS
&DUNN
(503) 224-4438
Case 19-31883-dwh11    Doc 273    Filed 07/28/20

EXHIBIT 1
Page 54 of 80

1    Q.  All right.  And how much do you estimate it will

2 cost to do the entitlement work -- sorry.  Aren't you

3 asking financing to fund the continuation of the

4 partition case?

5    A.  Yes.  And we don't know what that's going to

6 cost.

7    Q.  So that's an open-ended number.  Have you made

8 any estimate?

9    A.  Our estimates are constantly changing with the

10 catastrophic world events that we're currently in.

11    Q.  That may be true, but the question is have you

12 made -- provided any estimates to Sortis as to what that

13 would cost?  Have you ever done that?

14    A.  Again, we've had verbal talks about what that

15 would cost, but things, sir, have changed dramatically.

16    Q.  All right.  So give me a number that you gave to

17 them as an estimate.

18    A.  I don't recall exactly what that number we ended

19 up at.  There have been a lot of numbers thrown around.

20    Q.  More than half a million dollars; isn't that

21 right?

22    A.  There may have been discussions of more than a

23 half, yes.

24    Q.  And isn't there -- all right.  And what do you

25 think the estate -- the attorney fees have been to date

IBA
SYMONDS
&DUNN
(503) 224-4428
Case 19-31883-dwh11    Doc 273    Filed 07/28/20

EXHIBIT 1
Page 55 of 80

1    for the lawyers for the LLC and for your personal

2    lawyers, your personal law firm?

3        A.   I don't know.

4        Q.   You have no idea what that is?

5        A.   Correct.

6        Q.   Is it more than $100,000 for each firm?

7        A.   I don't know, sir.

8        Q.   You have no idea?

9        A.   Correct.

10       Q.   It could be $10,000 or it could be a half a

11   million dollars?

12       A.   It keeps going up by the minute as we sit here

13   and go over these questions of yours.  It's astronomical

14   what it's costing.

15       Q.   Have you reviewed the proofs of claim that have

16   been filed in your bankruptcy case?

17       A.   Yes.

18       Q.   Okay.  And how much are the unsecured claims that

19   have been filed in your bankruptcy case?

20       A.   I don't know what the exact number is.  Again, I

21   don't --

22       Q.   Do you have a ballpark estimate?

23       A.   You know, I owe Greg Miner a hundred and some

24   thousand.  I owe Dan Lorenz a small amount.  I'm not

25   prepared to tell you exactly what those numbers are, but

IBA
SYMONDS
&DUNN
(503) 224-4438

Case 19-31883-dwh11   Doc 273   Filed 07/28/20

EXHIBIT 1
Page 56 of 80

1   I intend to pay that all off, whatever I owe people.

2      Q.   So as to those lawyers, there's at least 100,000.

3   And in excess of that, there's a substantial -- you

4   would agree, would you not, that you owe a substantial

5   amount of money to your bankruptcy lawyer, for

6   Mr. Henderson's firm, and also the Perkins Coie firm

7   that represents the LLC; correct?  Wouldn't you say

8   that's a substantial number?

9      A.   I don't know how substantial or what you're

10  asking as substantial.  If you could tell me what

11  substantial --

12     Q.   Would you agree that there's probably over

13  $50,000 to each firm?

14     A.   I don't know.  I told you I don't know.

15     Q.   You never received a bill or a statement for fees

16  from them, from those firms?

17     A.   That's correct, that's correct.

18     Q.   All right.  In any event, the amount that you'll

19  need to fund all the expenses, would you not agree that

20  the amount that you're going to need to finance the

21  expenses to pay off all your other creditors through the

22  financing that you're proposing is going to be greater

23  than just the amount that's going to be necessary to pay

24  off your ex-wife?

25     A.   That's correct.

IBA
SYMONDS
&DUNN
(503) 224-4438
Case 19-31883-dwh11   Doc 273   Filed 07/28/20
EXHIBIT 1
Page 57 of 80

1      Q.  So -- and under your plan, that's -- is it not

2  correct that what you want to do is to pledge all of the

3  interest -- 50 percent interest in the farm; that is,

4  100 percent of the interest that the LL -- you know,

5  that you have currently in the name of the LLC, 15005

6  Northwest Cornell, the plan action contemplates that all

7  of that 50 percent interest in the farm will be pledged

8  to secure all of your personal debt that's going to be

9  paid off through this loan or the loan that would be

10  used to pay off your personal obligations and all of the

11  expenses of the -- your personal bankruptcy and all of

12  the expenses of the LLC in the bankruptcy case?

13      A.  I'm going to pay off everything -- I'm going to

14  pay off everything that I'm legally obligated to pay

15  off --

16      Q.  That's not my question, sir.  My question is

17  doesn't the plan, this financing proposed, to use as

18  collateral 100 percent of the 50 percent interest in the

19  farm; in other words, 100 percent of the dirt, not just

20  your 25 percent of the interest in the farm or what was

21  contemplated under the judgment to go to the trust, the

22  25 percent interest in the farm, that whole 50 percent

23  interest in the farm, under the financing that's being

24  proposed, all of that is to be pledged; correct?

25      A.  And my answer to that a couple of times has been

IBA
SYMONDS
&DUNN
(503) 224-4438
Case 19-31883-dwh11    Doc 273    Filed 07/28/20

EXHIBIT 1
Page 58 of 80

1    we haven't signed the loan documents yet, so --

2       Q.   But that's what it would take to get -- the

3    commitment from the lender is based on that collateral,

4    50 percent of the interest in the farm; correct?

5       A.   That may be the way that it -- that may be the

6    way that the loan documents end up, yes.  I don't know.

7       Q.   Well, that's the way they are -- that's the

8    nature of the commitment?

9       A.   Okay.

10      Q.   Is that not correct?

11      A.   That's what we've been in verbal talks with

12   figuring out what the security is going to be for Sortis

13   and we have to provided security to them to pay Tasha

14   off.

15      Q.   Well, you've signed a declaration that says you

16   have a commitment.  Either you have a commitment or that

17   you're still in negotiation with Sortis.  Are you still

18   in negotiations?

19      A.   No, I --

20      Q.   You don't have a commitment?

21      A.   No, I don't feel that it's in -- I don't feel

22   it's in negotiations.  I have a strong understanding

23   that they're going to pay the judgment off.  And then

24   we're -- and then hopefully we'll be able to -- when

25   things get -- if they ever get back to normal, the

IBA
SYMONDS
&DUNN
(503) 224-4428
Case 19-31883-dwh11    Doc 273    Filed 07/28/20

EXHIBIT 1
Page 59 of 80

1   economy, which is just terrible right now.  If you look

2   around, all the major liberal cities of the United

3   States are boarded up, all the businesses are boarded

4   up.  And it's been estimated that 40 percent of all

5   businesses will fail by this time next year and 60

6   percent of everybody that has a job today works for that

7   40 percent of businesses that will be closed in the next

8   year.  So we're looking for really, really serious stuff

9   here, sir.  Did you get that whole answer?  Did you get

10  my entire answer, sir?  40 --

11      Q.  Yeah --

12      A.  40 percent of all businesses will fail in the

13  next year.

14          MR. PAHL:  Your Honor, could we take a five-

15  minute break, please?

16          MR. ORR:  I would rather not, your Honor.

17          MR. PAHL:  I don't believe there's a

18  question pending.

19          THE COURT:  I think we took a break about an

20  hour ago.  Is there any reason not to wait for the usual

21  90 minutes before we take a break, Mr. Pahl?

22          MR. PAHL:  No.  It's just that sometimes

23  things get emotional and it's a good idea to let people

24  ease up a little bit, but I'm happy to continue.

25          THE WITNESS:  I'm okay.  I'm okay.  I can

IBA
SYMONDS
&DUNN
(503) 224-4438
Case 19-31883-dwh11   Doc 273   Filed 07/28/20

EXHIBIT 1
Page 60 of 80

1   continue.  That's okay.

2              THE COURT:  Okay.  Let's continue.

3         Go ahead, Mr. Orr.

4      Q.  (By Mr. Orr)  So your testimony is you do have a

5   commitment but -- from the lender, but you don't know

6   how much money -- you can't tell the court right now how

7   much the commitment is for financing or how much you, in

8   fact, would want to ask Sortis to provide in the way of

9   financing?

10     A.  Not right down to the dollar, no, sir, I don't.

11     Q.  Okay.  But it is substantial more than the amount

12  necessary to pay off your ex-wife?

13     A.  It's more than -- it's more than.  And I don't

14  want to use the word "substantial" or put any meaning to

15  that, but it's more than, you're correct, yes.

16     Q.  Okay.  So hang on one second.

17        So my question then, again, is, though -- and I

18  apologize.  Maybe you answered it, but I don't think so.

19  And that is whether or not this commitment to the

20  financing requires that the LLC pledge 100 percent of

21  its interest in the farm that is 50 percent of the dirt

22  itself.

23     A.  And I said that we haven't worked out the exact

24  security for the loans.

25     Q.  You haven't worked that out?  That's still in

IBA
SYMONDS
&DUNN
(503) 224-4128
Case 19-31883-dwh11    Doc 273    Filed 07/28/20

EXHIBIT 1
Page 61 of 80

1  negotiation?

2      A.  Yes, correct.

3      Q.  But the -- but Sortis's commitment is contingent

4  on that presently; correct?

5      A.  Well, you would have to have security for a loan.

6  If that's what you're asking, yes, that's correct.  A

7  loan is contingent on a security for a loan.

8      Q.  Right.  And it's going to be -- as far as Sortis

9  is concerned, it's going to be 100 percent of the LLC's

10  interest in the dirt that is 50 percent of the farm?

11          MR. HENDERSON:  Objection, your Honor.

12  Asked and answered numerous times.

13          THE COURT:  So, Mr. Orr, I've been holding

14  my fire here a little bit.  Let me express my concern.

15      There's a limited amount of time I think that all

16  of us have for this matter.  And I think that in the

17  context of a motion to dismiss, we need to focus on

18  what's at issue.  What's at issue is the good faith in

19  the filing of the petition, the good faith in

20  prosecuting the case, and even whether or not a

21  confirmation of a plan is factually impossible.  But not

22  every issue that might come up with respect to whether

23  or not a plan or -- could be confirmed I think is fair

24  game at this point.

25      So I'm happy to hear argument, if you disagree,

IBA
SYMONDS
&DUNN
(503) 224-4138

EXHIBIT 1
Page 62 of 80

Case 19-31883-dwh11   Doc 273   Filed 07/28/20

1  but I think the questions need to be limited to the

2  questions of good faith and whether or not a plan would

3  be factually impossible in any scenario as opposed to

4  whether or not it's -- that a particular plan that he

5  may be contemplating now might be subject to

6  confirmation opposition.

7          MR. ORR:  I appreciate the point, your

8  Honor.  I have at least one aspect of this is -- well,

9  I'll just -- I mean maybe I don't need to, but

10 Mr. Dinihanian has come in and said, Yeah, I'm here.

11 I'm protecting -- you know, I want to pay off the

12 creditors and I want to protect the trust, my daughter's

13 trust.

14         The point about all of this is his plan not only

15 doesn't protect the trust, it creates more risk for the

16 trust because all of the interest in the farm, all of

17 the interest in the farm is now pledged not just to

18 secure his ex-wife's -- the obligation to his ex-wife,

19 but also now to pledge all of the other debt, all the

20 pre-petition debt and all the administrative claims, all

21 the expenses of the estate, that's -- and future

22 expenses to go forward, then the trust is going to be --

23 the trust's interest will be put in jeopardy.  His half

24 interest in the dirt is 25 percent interest in the farm

25 is going to be put in jeopardy, and that is inconsistent

IBA
SYMONDS
&DUNN
(503) 224-4128
Case 19-31883-dwh11    Doc 273    Filed 07/28/20

EXHIBIT 1
Page 63 of 80

1  with Mr. Dinihanian's pronouncement that he's trying to

2  protect the trust and protect the interest of his

3  daughter, when, in fact, this plan, you know, he doesn't

4  intend to (inaudible) in the terms of the judgment

5  that -- and, in addition, according to what he said, you

6  know, he wants to do these other things and develop the

7  property, and that's only going to put the trust's

8  interest at greater risk.

9         So that's the reason for these questions, your

10 Honor.

11               THE COURT:  Okay.  And I have inferred that

12 from the line of questions.  I'm going to be very

13 sensitive to duplicative questions.  But go ahead,

14 Mr. Orr.

15               MR. ORR:  I understand.  Okay.  Thank you.

16    Q.  (By Mr. Orr)  Let me see.  Let me just check my

17 notes here.  One second.

18         Mr. Dinihanian, isn't it true that the debt to

19 your daughter for the $20,000 that you removed from her

20 account, you've not listed that in your schedules, your

21 personal schedules?

22    A.  I don't recall if that's been listed or not.

23    Q.  That's just one other thing you inadvertently

24 forgot to list, one other creditor, you're daughter?

25    A.  I don't know, sir.

IBA
SYMONDS
&DUNN
(503) 224-4438
Case 19-31883-dwh11   Doc 273   Filed 07/28/20

EXHIBIT 1
Page 64 of 80

 1      Q.  Isn't it true that this -- any reorganization is
 2  dependent upon the success of the partition lawsuit?
 3      A.  Well, we have -- we have a little ruling on the
 4  partition from Judge Hunsaker, and I'm not sure whether
 5  we're --
 6              THE COURTROOM DEPUTY:  You're muddled and I
 7  can't understand your answer.
 8      A.  We have a ruling by Judge Hunsaker and we haven't
 9  decided which way we're going to -- my attorneys are
10  going to go with her decision.
11      Q.  (By Mr. Orr)  Two things.  One is you filed these
12  bankruptcies more than a year ago, and you don't know
13  right now which way you want to go with regard to the
14  partition case?  You still don't know; do I have that
15  correct?
16      A.  With the tremendous devastation that's going on
17  in the world today, I think things are changing by the
18  day.  And so we're in a catastrophic situation right now
19  and I think that will be taken into account.
20      Q.  Well, that's been going on, this COVID business
21  has been going on for several months now.
22      A.  It's not COVID, sir, it's Antifa, BLM.  There's
23  now an estimated 25 million Antifa, anti-fascism people.
24  There are not only that group, but there are other
25  groups joining them.  These are people that have lost

IBA
SYMONDS
&DUNN
(503) 224-4438
Case 19-31883-dwh11    Doc 273    Filed 07/28/20

EXHIBIT 1
Page 65 of 80

1  their jobs, by and large, and they know that they're

2  never going to get their jobs back.  So they have an

3  agenda, and it's really quite, quite disturbing.

4      Q.  Disturbing to you, but --

5              (Inaudible interruptions)

6      A.  -- for you as well.

7      Q.  And how does that impact your ability to

8  determine how you want to proceed with the partition?

9      A.  That's correct.  I mean I -- I would have to use

10 world events to make decisions that are prudent to the

11 trust, my daughter, and for the property on Cornell in

12 how we're going to proceed.

13     Q.  So right now you don't have a plan as to how to

14 proceed?

15     A.  What I'm saying is my plans are changing by the

16 day, and I'm going to use my best judgment to run things

17 properly to try to maximize the value of my daughter's

18 trust.

19     Q.  But that's not what you agreed to as part of the

20 general judgment.  You agreed to remove, to separate

21 your financial entanglement with your daughter's trust

22 by deeding over the property, deeding over an interest

23 in the dirt to her, or to her trust, and then agreeing

24 to sell your interest in the dirt.

25             MR. HENDERSON:  Your Honor, I'm going to

IBA
SYMONDS
&DUNN
(503) 224-4438
Case 19-31883-dwh11    Doc 273    Filed 07/28/20

EXHIBIT 1
Page 66 of 80

1  object.  This has been asked and answered.

2         THE COURT:  Hold on, Mr. Orr.

3      What was the objection, Mr. Henderson?

4         MR. HENDERSON:  Asked and answered.  We've

5  already covered this.  It's cumulative.

6         THE COURT:  I'm going to sustain the

7  objection.

8      Q.  (By Mr. Orr)  My point, though, is regardless of

9  how you want to approach the partition case, there still

10  is more litigation to be undertaken with regard to the

11  partition case.  There would be various paths to take in

12  the partition case itself, but it exists.  It's not --

13  it doesn't come to an end and there will be more

14  litigation in the context of that partition case in

15  order for this ultimate completion of a plan; in other

16  words, the sale of any of the Cornell property; isn't

17  that right?

18      A.  That may be possible, correct.

19      Q.  Well, not possible.  Probable, if not certain,

20  under the circumstances.  I mean right now do you see a

21  different avenue other than proceeding with that

22  litigation, the partition litigation?

23      A.  Well, that would be -- I don't know whether

24  you're -- you're authorized to make a judgment on

25  whether or not it's going to happen the way that you

IBA
SYMONDS
&DUNN
(503) 224-4438
Case 19-31883-dwh11    Doc 273    Filed 07/28/20
EXHIBIT 1
Page 67 of 80

1  just said or not.  I don't think you have the ability to

2  make a judgment like that.

3     Q.  My question is do you not agree that whatever

4  plan you -- in order for you -- you've told the court

5  that you think you want to try to maximize the value of

6  the real estate for the benefit of yourself and then

7  also your daughter's trust; correct?

8     A.  Well --

9     Q.  That's your goal?

10    A.  Yeah.  The only reason why I put myself in there

11  is because I'm the one with the fiduciary responsibility

12  to my daughter's trust and I have to be in good shape to

13  be able to make sure that I maximize the value of her

14  trust, yeah.  That's the only reason.  I -- I don't -- I

15  don't have a lot of needs for anything other than paying

16  utilities and food for myself and very little expenses

17  other than this case.  And I'd like to get this case

18  over and done with as soon as possible so that we can

19  move forward.

20    Q.  Just a couple quick questions.  But you're not

21  the trustee of the trust; correct?

22    A.  I'm the trustor.  I'm the trustor.

23    Q.  But you're not the trust, you're not the trustee

24  of the trust?

25    A.  The trust has no money in it.

IBA
SYMONDS
&DUNN
(503) 224-4438
Case 19-31883-dwh11    Doc 273    Filed 07/28/20

EXHIBIT 1
Page 68 of 80

1     Q.  You're not the trustee of the trust?

2     A.  The trustee, you know, the trustee doesn't have a

3  job because there is no money to be the trustee of.  I'm

4  the trustor of the trust, you know.

5           MR. ORR:  Your Honor, because of the time,

6  I'll stop here.  Thank you.

7           THE COURT:  Okay.  Thank you.  I obviously

8  want to give an opportunity for redirect.  I do think

9  it's appropriate to take a ten-minute break now; so

10  let's -- I think it's about almost 11:30.  Let's

11  reconvene at 11:40.  Thank you.  We're adjourned for

12  now.

13           MR. HENDERSON:  Thank you.

14           THE WITNESS:  Thank you.

15           [RECESS]

16           THE COURT:  Okay.  We're back on the record.

17  And I'll turn to Mr. Henderson or Mr. Pahl, whoever

18  wants to go first.

19           MR. ORR:  Your Honor, I'm sorry to

20  interrupt.  Just a little housekeeping measure.  This is

21  Bruce Orr.

22     We had also submitted yesterday a couple of

23  declarations; they're Docket 157 and 159.  And I just

24  wanted to make sure -- I don't believe there were any

25  objections to them, but if there are, I guess I just

IBA
SYMONDS
&DUNN
(503) 224-4138

Case 19-31883-dwh11   Doc 273   Filed 07/28/20

EXHIBIT 1
Page 69 of 80

1   wanted to -- we can either deal with it now or later.  I

2   just wanted to raise that right now, but thank you.

3           THE COURT:  Well, I appreciate that.  I

4   think conceptionally we're dealing with one witness at a

5   time; so we're treating Mr. Dinihanian as having been

6   called by Ms. DuBay and we're going through the various

7   examinations of him.  I would perceive the other

8   declarations offered on behalf of the movant to be

9   additional evidence.  And certainly the offer into

10  evidence is appropriate, but I think technically it

11  should come up when we've release Mr. Dinihanian as a

12  witness.

13          So Mr. Pahl or Mr. Henderson?

14          MR. PAHL:  This is Doug Pahl.  I'll go next.

15  Thank you, your Honor.

16

17              REDIRECT EXAMINATION

18  BY MR. PAHL:

19    Q.  Mr. Dinihanian, I'm just going to have a few

20  questions to follow up on Mr. Orr's questions for you.

21          And did you understand that he was representing

22  the trust and not Ms. Teherani-Ami, your ex-wife?

23    A.  Yes.

24    Q.  All right.  So going back to the judgment that

25  has been referred to a number of times in this matter,

IBA
SYMONDS
&DUNN
(503) 224-4438

Case 19-31883-dwh11   Doc 273   Filed 07/28/20

EXHIBIT 1
Page 70 of 80

1   was 15005 LLC a party to that judgment?

2            MR. ORR:  Objection, your Honor.  Calls for

3   a legal conclusion.

4            THE COURT:  I agree.  I think it's pretty

5   clear who the parties are to the judgment.  I'll sustain

6   the objection.

7            MR. PAHL:  I was just trying to clarify.

8   Well, I can just ask a factual question.

9      Q.  (By Mr. Pahl)  Did 15005 execute that judgment?

10     A.  No.

11           MR. ORR:  Objection, calls for a legal

12  conclusion.

13           THE COURT:  Overrule the objection.

14       Go ahead, Mr. Pahl.

15     Q.  (By Mr. Pahl)  There's a portion in the judgment

16  that refers to Eagle Holdings being deemed to be the

17  owner of 25 percent of the farm.  Did you regard that as

18  25 percent direct ownership of the real property?

19     A.  No.

20           MR. ORR:  Objection, your Honor.  It -- he

21  can't testify about -- to try to -- he's testifying

22  about a court document.  The question is was the -- what

23  the intent was.  If there's some ambiguity about this

24  document, then he can testify about it.  But, you know,

25  try to get it in that way --

IBA
SYMONDS
&DUNN
(503) 224-4438

Case 19-31883-dwh11   Doc 273   Filed 07/28/20

EXHIBIT 1
Page 71 of 80

1              THE COURT:  I'm going to -- thank you.  I'm

2    going to overrule the objection.  You cross-examined him

3    at great length about his understanding of what the

4    document meant, and I think it's fair game for redirect.

5         Go ahead, Mr. Pahl.

6         Q.  (By Mr. Pahl)  There are a number of questions

7    asked to you what value, what consideration was given in

8    exchange for the agreement to give a deed to the trust.

9         What value did 15005 LLC receive in exchange for

10   that property --

11        A.  Nothing, nothing.

12        Q.  Okay.  When we're referring to the trust,

13   Mr. Orr's client, is, in your mind, is the trust a

14   creditor or is it a membership or equity in 15005?

15        A.  It's an equity.

16        Q.  Yeah.  What impact, in your view, would delivery

17   of the deed to the trust, as is being demanded here,

18   have on the value of the property?

19        A.  It would -- it would be very damaging to the

20   value of the property.  It's how --

21        Q.  How so?

22        A.  We need to move forward with as little legal, you

23   know -- I don't know what you would call it, but we need

24   to move forward with a nice, clean piece of property,

25   which is, you know, it's -- the county and the PUD

IBA
SYMONDS
&DUNN
(503) 224-4428
Case 19-31883-dwh11   Doc 273   Filed 07/28/20

EXHIBIT 1
Page 72 of 80

process, it's a 2500-page document that needs to be produced, according to Judge Hunsaker, to be able to market that property, and that's what just needs to be done.

Q. Let me ask it a little different way. What's the best way to unlock the value of the property or to increase appreciation in the property?

A. Have a PUD written. Like I said, it's a 2500-page document. It takes a year to do and it's the most important part of being able to enhance the value of that property.

Q. Okay. And what impact would transferring a deed to the trust have on the partition case, which you've indicated you expect to continue in some form?

A. Could you ask that a different way? I don't understand.

Q. The partition case has gone forward without a deed being delivered to the trust. Would it complicate or simplify the partition case to have --

A. It would complicate, it would complicate it.

Q. When you say that you would -- your intent throughout these proceedings and prior to the filing was to pay all of your creditors in full, does that include a payment to the trust?

A. No.

1    Q.   Have you had -- and I don't want you to get into

2  any discussions because some of them are privileged, but

3  have you considered buying the trust's interest or

4  borrowing sufficient funds to pay the trust in full for

5  its -- or over time for its interest here?

6    A.   We've had discussions about a lot of different

7  things, yeah.

8    Q.   Okay.  And your lender, Sortis, that you

9  testified about on direct, has been prepared to finance,

10 let's just start with, the payment of all parties who

11 have allowed claims in the bankruptcy case; is that

12 correct?

13   A.   Correct.

14   Q.   And that's -- that's one particular number.  If

15 you were to change to a scenario where you bought the

16 interest of the trust, that number would be higher;

17 isn't that correct?

18   A.   Correct.

19   Q.   Are you prepared in the very near future to move

20 forward to introduce a plan that will pay all of your

21 creditors in full?

22   A.   Yes.

23   Q.   And is it your intent and has it been your intent

24 throughout these proceedings to maximize the value of

25 your estate for all parties concerned?

IBA
SYMONDS
&DUNN
(503) 224-4438
Case 19-31883-dwh11   Doc 273   Filed 07/28/20
EXHIBIT 1
Page 74 of 80

 1              MR. ORR:  Objection, leading.

 2              THE COURT:  I'll overrule the objection.

 3              MR. PAHL:  Yeah, I'll restate it.

 4     Q.  (By Mr. Pahl)  What has your intent been

 5  throughout these proceedings, and as you've filed the

 6  bankruptcy cases, signed the petitions, and throughout

 7  every stage of this process, what has your intent been?

 8     A.  To maximize the value of my daughter's trust.

 9     Q.  Have you transferred a deed to the trust?

10     A.  No.

11              MR. PAHL:  Nothing further, your Honor.

12              THE COURT:  Thank you.

13          Mr. Henderson?

14              MR. HENDERSON:  Thank you, your Honor.  I

15  don't think I have any follow-up questions.

16              THE COURT:  Thank you.

17          Anything in response, Mr. Orr?

18              MR. ORR:  Just one second, your Honor.

19  There's just maybe one question, your Honor.

20

21                    RECROSS-EXAMINATION

22  BY MR. ORR:

23     Q.  Mr. Dinihanian, it was discussed -- or you were

24  asked about the consideration that the LLC may have

25  received or not received for a deed to the trust -- if

1    there was a deed to the trust for 25 percent of the

2    interest in the farm.  Do you remember being asked about

3    that?

4        A.  Yes.

5        Q.  The transfer by the trust of an interest in the

6    LLC, you would agree, would be of some value to Eagle

7    Holdings; correct?

8              MR. HENDERSON:  Objection, calls for --

9        A.  No.

10             MR. HENDERSON:  Sorry about that.

11   Withdrawn.

12       Q.  That wouldn't be of any value to Eagle Holdings?

13       A.  No.

14       Q.  And why do you say that?

15       A.  That would just complicate matters.

16             THE COURTROOM DEPUTY:  I'm sorry, Mr. Orr

17   and the witness, I need you -- you're both sounding

18   pretty muddled.  If you're on speaker phones, can you

19   pick up the handset, please.

20             MR. ORR:  Sorry.  Thanks.  Sorry.

21       Q.  (By Mr. Orr)  The deed to the trust would be --

22   if the trust received a deed under the judgment, the

23   trust would then also give back a half interest -- or

24   its interest in the LLC; correct?  That's what was

25   contemplated, you'd agree?

IBA
SYMONDS
&DUNN
(503) 224-4138
Case 19-31883-dwh11   Doc 273   Filed 07/28/20

EXHIBIT 1
Page 76 of 80

1    A.   Can you state that a different way?

2    Q.   In exchange for a deed and the trust would give

3 its interest in the LLC, would give out that interest,

4 it would no longer have the interest in the LLC;

5 correct?

6    A.   The trust would no longer have an interest in the

7 LLC.  Yeah, I -- I would have to talk to counsel about

8 that.

9    Q.   Well, that -- you wouldn't -- it was your -- is

10 it your understanding that the LLC -- I'm sorry, the

11 trust would continue to be -- have an equity position,

12 an equity interest in 15005 Northwest Cornell if it --

13              (Inaudible interruptions)

14   Q.   -- deed to the prop -- What's that?

15   A.   15005 LLC is not a party to the judgment.

16   Q.   My question is this.  If the trust received a

17 deed to the -- to the farm, with the 25 percent interest

18 in the farm --

19   A.   That would be damaging to the trust, yeah.

20   Q.   -- it would be damaging to the trust?

21   A.   Correct.

22   Q.   Like the point -- But if it received the deed,

23 then you agree the deal was that it would no longer be a

24 member of the LLC; correct?

25   A.   Like I said, I'd have to talk to counsel and

IBA
SYMONDS
&DUNN
(503) 224-4438
Case 19-31883-dwh11   Doc 273   Filed 07/28/20        EXHIBIT 1
Page 77 of 80

1  confer with them on the answer to that.

2      Q.  You said that the trust -- it would be damaging

3  to the trust to receive a deed to the farm?

4      A.  Correct.

5      Q.  Why do you -- what -- would it not be, then,

6  have -- but the trust then would own the dirt, have an

7  interest in the dirt, similar to the other owners -- the

8  other tenants in common with regard to the farm.  So how

9  would that -- why would the trust be harmed if it had a

10 quarter interest in the farm?

11     A.  It would just convolute the process of taking it

12 through the entitlement to the property.

13     Q.  Because the entitle -- what you want is all of

14 the dirt, all of the 50 percent interest in the farm in

15 order to do this development?

16     A.  What I want is just to make it possible to pay

17 off this judgment and my creditors and maximize my

18 daughter -- maximize my daughter's trust.

19                (Inaudible interruptions)

20            MR. ORR:  Nothing else.

21            THE COURT:  Thank you, Mr. Orr.

22        Ms. DuBay, do you have anything?

23            MS. DUBAY:  No, your Honor.

24            THE COURT:  Okay.  We've got a little bit of

25 reverberation going on.  I'm going to ask everyone to

IBA
SYMONDS
&DUNN
(503) 224-4128

Case 19-31883-dwh11    Doc 273    Filed 07/28/20

EXHIBIT 1
Page 78 of 80

```
 1   put your phones on mute until I call on you again.
 2          Let's turn to Mr. Pahl, anything in response to
 3   Mr. Orr's questions?
 4                MR. PAHL:  I don't think so, your Honor.
 5                THE COURT:  Okay.  Mr. Henderson?
 6                MR. HENDERSON:  No, your Honor.
 7                THE COURT:  Okay.  Mr. Dinihanian, thank
 8   you.  You're excused as a witness.
 9                [TESTIMONY CONCLUDED]
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

IBA
SYMONDS
&DUNN
(503) 224-4438

Case 19-31883-dwh11    Doc 273    Filed 07/28/20

EXHIBIT 1
Page 79 of 80

```
1              C E R T I F I C A T E

2

3         I, Joyce M. Dunn, a Certified Shorthand

4   Reporter in the State of Oregon, do hereby certify that

5   I reported in stenotype the foregoing audio recorded

6   proceedings had upon the hearing of this matter

7   previously captioned herein; that I thereafter reduced

8   my said stenotype notes to typewriting; and that the

9   foregoing transcript, Pages 1 to 79, both inclusive,

10  constitutes a full, true and accurate record of said

11  audio recorded proceedings to the best of my knowledge,

12  ability, belief, and quality of the recording.

13        Witness my hand as Certified Shorthand Reporter

14  at Portland, Oregon, this 27th day of July 2020.

15

16

17

18

19

20

21

22

23        Joyce M. Dunn, CSR, CCR, RPR
          OR Certificate No. 90-0128, exp. 6/30/23
24        WA Certificate No. 2412, exp. 5/21/21
          National RPR Certificate exp. 9/30/20

25
```



IBA
SYMONDS
&DUNN
(503) 224-4438
Case 19-31883-dwh11    Doc 273    Filed 07/28/20
EXHIBIT 1
Page 80 of 80